## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 12-783

**CAROLYN L. MOSS**

**VERSUS**

**GEORGE A. GOODGER**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 15817
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and
Phyllis M. Keaty, Judges.

**REVERSED AND REMANDED.**

**Gregory Norman Wampler**
**Lemoine & Wampler**
**607 Main Street**
**Pineville, LA 71360**
**Telephone: (318) 473-4220**
**COUNSEL FOR:**
      **Plaintiff/Appellee - Carolyn L. Moss**

**Brian K. Thompson**
**Law Offices of Brian K. Thompson, A.P.L.C.**
**P. O. Box 13984**
**Alexandria, LA 71315**
**Telephone: (318) 473-0052**
**COUNSEL FOR:**
      **Defendant/Appellant - George A. Goodger**

**THIBODEAUX, Chief Judge.**

In this contentious custody dispute, George Goodger contests the trial court's judgment of primary, domiciliary custody of thirteen-year-old Hoyt to his former partner, Carolyn Moss. Mr. Goodger asserts that Ms. Moss is volatile and emotionally unstable and that the trial court's judgment in Ms. Moss' favor, following an evaluation of La.Civ.Code art. 134, was an abuse of discretion. For the following reasons, we agree with Mr. Goodger and reverse the judgment of the trial court.

I.

**ISSUES**

We will consider whether the trial court abused its discretion in awarding primary, domiciliary custody of Hoyt to Ms. Moss.

II.

**FACTS AND PROCEDURAL HISTORY**

Mr. Goodger and Ms. Moss never married but lived together for many years. The parties had one child together, Hoyt Goodger, who was born on March 26, 1999. At the end of their relationship,[1] the parties reached a verbal agreement regarding child custody and support that was neither filed with, nor sanctioned by, the court. The parties agreed to joint custody of Hoyt, with Ms. Moss designated as the domiciliary parent, subject to reasonable visitation by Mr. Goodger. The parties agreed that Mr. Goodger would pay Ms. Moss $215.00 per month in support of Hoyt.

Both the financial agreement and the custody agreement proved unworkable by the parties. Notably, Ms. Moss repeatedly requested extra money

---

[1] The record reflects conflicting evidence regarding the termination of the parties' romantic relationship. The termination occurred in either 2005 or 2008.

from Mr. Goodger, and Ms. Moss testified that the utilities at her home were disconnected more than once because she forgot to pay the utility bill. Mr. Goodger testified that Ms. Moss complained of receiving eviction notices and of not having enough food for Hoyt. The parties' relationship became more strained upon the marriage of Mr. Goodger to his wife, Stacy. Ms. Moss expressed outward hostility toward Stacy and frequently referred to her as a "crack whore."

Mr. Goodger testified regarding several incidents where Ms. Moss displayed hostility toward himself, Stacy, and Hoyt. He described an incident where Ms. Moss pointed a gun at him and Stacy. Ms. Moss received probation following that incident. He also testified that Ms. Moss yelled and cursed at Hoyt on several different occasions.

Following an occurrence at a ballpark, Mr. Goodger enlisted the services of Mary Girard, a licensed professional counselor, to assist Hoyt in handling his mother's emotional outbursts. Ms. Girard testified that she was concerned about Hoyt's emotional well-being due to his mother's mood swings and irrational behaviors. Ms. Girard noted that Hoyt was "hurt and scared about conflicts that he would witness" between the parties, and she recommended that a mental health professional evaluate Ms. Moss.

Shortly after Hoyt began counseling sessions with Ms. Girard, Mr. Goodger filed a rule to modify the custody agreement between the parties so as to designate him as the domiciliary parent, subject to visitation by Ms. Moss. Mr. Goodger also requested an order requiring Ms. Moss to pay him monthly child support in accordance with the income of the parties.

Ms. Moss filed a counter-rule, alleging that Mr. Goodger was not entitled to custody or joint custody due to his history of perpetrating family violence. Throughout the trial court proceedings, Ms. Moss did not offer any evidence of this alleged violence. She sought sole custody of Hoyt, with only

2

restricted or supervised visitation rights for Mr. Goodger. She also sought child support.

On June 21, 2011, the parties reached an agreement which was contained in an Interim Order signed by the trial court. The Interim Order granted the parties shared custody of Hoyt on an alternating one-week basis. It also required the parties to submit to mental health evaluations that would assist the court in the determination of custody. Moreover, the Interim Order required Mr. and Mrs. Goodger, Ms. Moss, and Ms. Moss' boyfriend, Greg Delaney, to undergo drug testing. The Interim Order also contained various other requirements that prohibited the parties from: (a) interfering with visitation and communication between Hoyt and the other party; (b) communicating with each other through Hoyt; and (c) pressuring Hoyt or placing him in the middle of the proceedings.

On November 2, 2011, Mr. Goodger filed a Rule for Contempt and Other Relief seeking to hold Ms. Moss in contempt for refusing to submit to a mental health evaluation, for preventing all communication between Hoyt and Mr. Goodger during Ms. Moss' visitation with Hoyt on certain dates, and for calling law enforcement authorities unnecessarily to interfere with Mr. Goodger's visitation with Hoyt.

At the conclusion of the hearing on the Rule, the trial court held that the previously ordered psychological evaluations of the parties were unnecessary. The trial court held Ms. Moss in contempt for her "willful disobedience" of the Interim Order by failing to transfer Hoyt at the time ordered and by interfering with the telephone communications between Hoyt and his father. The trial court stated that it would take Ms. Moss' contempt into consideration when determining the parties' ability to facilitate a relationship between the child and the other parent.

Following a hearing on Mr. Goodger's Rule for Modification of Custody and Other Relief, the trial court denied Mr. Goodger's request to be designated as the primary, domiciliary parent. It cited the best interest of Hoyt as its primary reason. The trial court maintained joint custody and Ms. Moss' designation as the primary, domiciliary parent of Hoyt subject to specified visitation rights of Mr. Goodger.

III.

## LAW AND DISCUSSION

### Standard of Review

The trial court is in the best position to ascertain the best interest of the child which is the paramount consideration in determining child custody. La.Civ.Code art. 131; *Evans v. Lungrin,* 97-541 (La. 2/6/98), 708 So.2d 731. Accordingly, the trial court's determination regarding child custody is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. *Aucoin v. Aucoin*, 02-756 (La.App. 3 Cir. 12/30/02), 834 So.2d 1245. A trial court's determination of a child's best interest is usually based heavily on factual findings. *Henry v. Henry,* 08–689 (La.App. 1 Cir. 9/23/08), 995 So.2d 643. It is well settled that an appellate court cannot set aside a trial court's factual findings in the absence of manifest error or unless the findings are clearly wrong. *Rosell v. ESCO,* 549 So.2d 840, 844 (La.1989). In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record clearly establishes that the fact finder is clearly wrong or manifestly erroneous. *Stobart v. State, DOTD,* 617 So.2d 880, 882 (La.1993). If the trial court's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced it would have weighed the evidence differently had it been the trier of fact. *Rosell,*

549 So.2d at 844. An appellate court, however, is not compelled to slavishly rubberstamp a trial court's finding. *See, Butler v. Zapata Haynie Corp.,*92-71 (La.App. 3 Cir. 2/23/94), 633 So.2d 1274, *writ granted in part*, *judgment amended by*, 94-1171 (La. 7/5/94), 639 So.2d 1186, *cert. denied,* 115 S.Ct. 579 (1994). Indeed, an appellate court is constitutionally mandated to review facts. *Ambrose v. New Orleans Police Dep't Ambulance Serv.*, 93-3099 (La. 7/5/94), 639 So.2d 216.

## Discussion

## Modification of Child Custody

Mr. Goodger asserts that the trial court abused its discretion by awarding primary, domiciliary custody of Hoyt to Ms. Moss. We agree.

The nature of the original custody award dictates the burden of proof a party has when seeking to modify a prior permanent custody award. When the original custody decree is a stipulated or consensual judgment, any party seeking the modification of custody must prove that there has been a material change in circumstances since the original decree, as well as prove that the proposed modification is in the best interest of the child. *Aucoin*, 834 So.2d 1245.

The parties in this case were subject to a stipulated joint custody decree, and Mr. Goodger requested a modification of custody. Specifically, he requested that the court designate him as the primary, domiciliary parent of Hoyt, subject to reasonable visitation by Ms. Moss. Thus, the burden of proof to change the consensual agreement regarding Hoyt's physical custody fell on Mr. Goodger to show that (1) there had been a material change in circumstances affecting Hoyt's welfare since the original decree was entered and (2) his particular proposed modification was in Hoyt's best interest.

We find that that Mr. Goodger properly met his burden in seeking a modification of custody. Mr. Goodger showed that Ms. Moss failed to comply

with the custody agreement, and he produced evidence that his modification would be in Hoyt's best interest.

The primary consideration in our analysis of a child custody determination is always the best interest of the child. La.Civ.Code art. 131. To determine the best interest of the child for a feasible sharing arrangement under La.R.S. 9:335(A)(2)(b), the trial court must weigh twelve nonexclusive factors that are enumerated in La.Civ.Code art. 134:

(1) The love, affection, and other emotional ties between each party and the child.

(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6) The moral fitness of each party, insofar as it affects the welfare of the child.

(7) The mental and physical health of each party.

(8) The home, school, and community history of the child.

(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11) The distance between the respective residences of the parties.

(12) The responsibility for the care and rearing of the child previously exercised by each party.

The trial court is not bound to make a mechanical evaluation of all of the statutory factors listed in La.Civ.Code art. 134, but it should decide each case

6

on its own facts in light of those factors. "Moreover, the trial court is not bound to give more weight to one factor over another; and, when determining the best interest of the child, the factors must be weighed in view of the evidence presented." *Ketchum v. Ketchum,* 39,082, p. 5 (La.App. 2 Cir. 9/1/04), 882 So.2d 631, 636. "Further, in determining what the best interest of the child is in a change of custody case, courts must examine all relevant factors including stability of environment, standard of living each parent can provide, and the prior history of the child's custody." *Id.* at 637.

With these principles in mind, we turn to the evidence presented at the trial on the modification of custody in this case. Since the parties' separation through June, 2011, Ms. Moss was Hoyt's primary caretaker. In June, 2011, the court approved a week-by-week custody arrangement.

The evidence presented to the trial court revealed that Hoyt is a thirteen-year-old boy who is experiencing emotional difficulties due to the tumultuous relationship of his parents. Because of these difficulties, Mr. Goodger began bringing Hoyt to counseling sessions with Ms. Girard. During the trial, Ms. Girard provided testimony regarding Hoyt's emotional well-being. The trial court also heard testimony from Mr. Goodger, Mrs. Stacy Goodger, Mrs. Margie Goodger, Mr. Goodger's mother, and Ms. Moss.

The trial court accepted Ms. Girard as an expert in the field of family counseling. She testified that she first met Hoyt on March 25, 2011, and she counseled him for nine sessions, ending on September 8, 2011. During that time, Ms. Girard testified that she became very concerned about Hoyt's emotional well-being. She stated that Ms. Moss' emotional outbursts and anger victimized Hoyt. In particular, Ms. Girard noted that Ms. Moss "had some emotional instability," and she recommended that a mental health professional assess Ms. Moss. Ms. Girard testified that she observed this victimization personally at the courthouse on

7

the day of a hearing. While in the lobby, Ms. Girard observed Hoyt crying while his mother talked with him "roughly." Ms. Girard testified that she notified Ms. Moss' attorney of the incident in hopes that he would intervene. Ms. Girard concluded her testimony by stating that further counseling would not benefit Hoyt unless a change in his environment occurred.

Mr. Goodger also testified to Ms. Moss' unstable emotional state. In particular, he described three incidents that the trial court evaluated in its reasons for judgment. Mr. Goodger described that Ms. Moss has never accepted his new wife, Stacy. He testified that in 2008, when he and Stacy were engaged, they encountered Ms. Moss while they were riding four-wheelers. Ms. Moss attempted to run Mr. Goodger and Stacy off the road with her vehicle. Mr. Goodger testified that when they returned to his house, Ms. Moss pulled into the driveway. Mr. Goodger noticed that Hoyt was sitting in the passenger seat of Ms. Moss' car. Ms. Moss then pulled out a gun and stated that she was going to "blow [their] f'ing brains out." Mr. Goodger quickly escorted Stacy into the house and called 9-1-1. He testified that Ms. Moss later told him that she was placed on probation, was ordered to pay a fine, and was ordered to attend anger management classes as a result of the incident.

Mr. Goodger testified that Ms. Moss' hostility toward Stacy continued after they married. He described an incident that occurred in March 2011 at Hoyt's baseball practice. When Mr. Goodger arrived at the ballpark with Hoyt's equipment, Ms. Moss approached him and told him that it was fine if Hoyt played ball, but "if [he] brought the f'ing crack whore to the ballpark, she would snatch him off the field and he wouldn't ever come back." Mr. Goodger explained that by "crack whore," Ms. Moss was referring to his wife, Stacy. He testified that Hoyt went home with Ms. Moss that evening, but Hoyt called him later that night. Mr. Goodger explained what transpired during their conversation:

8

> When I answered the phone, he was squalling, just
> uncontrollably, that can't breathe, just terrible cry,
> saying, 'Daddy please come get me. Please come get
> me.' And Carolyn was in the background screaming,
> hollering, cussing, 'I can't f'ing stand you, you're just
> like your f'ing daddy, I don't ever want to f'ing see you
> again.' And, he would just, every breathe, [sic] 'please
> come get me, please come get me.'

Mr. Goodger testified that he immediately drove to Ms. Moss' home accompanied by the Pollack Sheriff's Department. The Pollack deputy entered the home and talked with Ms. Moss. The deputy and Ms. Moss then went outside, told Mr. Goodger that everything was fine, and asked him to leave. Ms. Moss did not allow Mr. Goodger to take Hoyt with him.

Mr. Goodger also described an incident that occurred at the Grant One Stop convenience store. He testified that he received a telephone call from Ms. Moss asking him to meet her at the Grant One Stop to retrieve Hoyt. She explained that her father was dying, and she needed to travel to Mississippi. Mr. Goodger testified that he arrived at the store and observed Ms. Moss "screaming, hollering, and cussing at someone on the phone." Mr. Goodger told Hoyt to remove his belongings from his mother's vehicle and place them in his truck. At that point, Ms. Moss ended her telephone conversation and started screaming at Hoyt to get back in her vehicle. He assured Ms. Moss that Hoyt would be fine with him, but she insisted that Hoyt "get back in the f'ing truck." Ms. Moss then called 9-1-1 and reported that "some man" was attempting to kidnap her son, without identifying him as Hoyt's father.

Stacy Goodger testified that she, too, has witnessed Ms. Moss' erratic behavior. She stated that she and Ms. Moss have not had any one-on-one interactions. Rather, she has observed Ms. Moss calling her a "crack whore" on several occasions. As to her personal relationship with Hoyt, Stacy testified that she and Hoyt have a "normal" relationship. They play with their dog together, they go to the park, and he helps her cook.

Margie Goodger testified that she lives next door to Mr. Goodger and acts as the intermediary for Mr. Goodger and Ms. Moss during custody drop-offs. Moreover, she cares for Hoyt when Mr. Goodger travels out of town. She explained that she is retired and that it is not a burden to care for Hoyt. Though she has not witnessed any physical interactions between Hoyt and Ms. Moss, she has observed, on several occasions, Hoyt crying on the phone while talking with his mother.

Ms. Moss presented no witnesses but testified on cross-examination about all of the incidents described above. She refuted Mr. Goodger's account of the four-wheeling incident and testified that, though she had a gun in her vehicle, she did not point it at Mr. Goodger and Stacy. Ms. Moss admitted to calling the police at the Grant One Stop, but she asserted that Mr. Goodger acted violently toward her and toward Hoyt, prompting her to call the authorities. With regard to the incident at the ballpark and the night following it, Ms. Moss admitted that she told Hoyt: "If you want to go live with your dad, call him if you want to." She also admitted screaming at Hoyt the following: "Tell your f'ing daddy to come get you." Ms. Moss took issue with Ms. Girard's characterization of her emotional stability and disputes that she needs counseling. She alleges that Hoyt prefers to live with her and that he does not enjoy spending time with his grandmother. Moreover, she testified that Mr. Goodger works out of town a great deal, leaving Hoyt in the care of his grandmother.

After listening to the testimony, the trial court determined that Mr. Goodger had not proven that a change in custody was warranted. In its reasons for judgment, the trial court examined each factor enumerated in Article 134. In doing so, the trial court found that Ms. Moss and Mr. Goodger "tied" with regard to the following factors: love, affection, and other emotional ties between each party and the child; the capacity and disposition of each party to give the child love,

affection, and spiritual guidance and to continue the education and rearing of the child; stability of environment; the moral fitness of each party; the home, school, and community history of the child; the reasonable preference of the child; and the distance between the respective residences of the parties.

The trial court found that the third factor—the capacity and disposition of each party to provide the child with food, clothing, and other material needs—favored Mr. Goodger. In particular, the court noted the testimonies of both Ms. Moss and Mr. Goodger regarding Ms. Moss' inability to pay various utilities and her reliance on Mr. Goodger for extra money. The trial court also referenced Mr. Goodger's initiative in bringing Hoyt to counseling in weighing that factor in Mr. Goodger's favor. The court also found that the fifth, seventh, and tenth factors—permanence of a custodial home; the mental and physical health of each party; and the willingness of the parties to facilitate relationships—weighed in favor of Mr. Goodger. The trial court was particularly struck by Mr. Goodger's testimony regarding the four-wheeler incident and the Grant One Stop incident and by Ms. Girard's testimony regarding the courthouse incident. The trial court specifically stated its belief in Mr. Goodger's and Ms. Girard's version of those events. Indeed, the trial court admonished Ms. Moss and stated, "since June, 2011, we've had a lot of complaints, Ms. Moss, about what you've done, but, we haven't had any complaints about what Mr. Goodger has done. . . ." The trial court further reprimanded Ms. Moss regarding her "crack whore" comments about Stacy Goodger and about Ms. Moss' tendency to act verbally abusive in Hoyt's presence.

Despite the trial court's numerous concerns, it allowed the only factor that weighed in Ms. Moss' favor—the responsibility for the care and rearing of the child previously exercised by each party—to govern its judgment on the issue of custody. Specifically, the trial court determined that due to Mr. Goodger's work

11

schedule, Hoyt's best interest would be served by maintaining Ms. Moss' status as domiciliary parent. In rendering the judgment, the trial court stated, "Mr. Goodger, if you worked a job where you were home every evening, this would be a very easy case." The trial court then granted Mr. Goodger custody of Hoyt on the first, second, and fourth weekends of each month, alternating holidays, and two weeks during the summer.

After reviewing the record in its entirety in light of the applicable jurisprudence, we conclude that the trial court abused its discretion in finding that Mr. Goodger did not satisfy his burden of proving both a change in circumstances materially affecting Hoyt's welfare and that Hoyt's best interests are served by modifying the custody decree to designating Mr. Goodger as the domiciliary parent. In short, we find that the trial court's articulated reasons for judgment are in direct conflict with its ultimate conclusion. Specifically, we note that the trial court clearly believed Mr. Goodger's testimony regarding the four-wheeler incident. In that incident, Mr. Goodger testified that while then nine-year-old Hoyt was present, Ms. Moss aimed a firearm at him and Stacy. The trial court also gave credence to the testimony of Ms. Girard, who testified that she witnessed a hostile encounter between Hoyt and his mother in the courthouse. After observing a crying Hoyt being verbally accosted by his mother, Ms. Girard felt compelled to bring the incident to an attorney's attention. The trial court also directly addressed Ms. Moss' actions at the Grant One Stop. It called her decision to report a kidnapping to authorities "wrong." Finally, the trial court assessed Ms. Moss' credibility. Calling Ms. Moss' truthfulness into question, the trial court stated, "[S]ome of the stuff you told me today hasn't been the truth."

It is evident that the trial court adjudged Ms. Moss not only as untruthful but also as emotionally unstable. It ordered her to undergo a psychological evaluation and repeatedly admonished her for her behavior toward

the Goodgers, stating, "you need to stop treating them like crap, because, you [sic] been treating them like crap." Its acknowledgement that this would be an "easy case" but for Mr. Goodger's job is greater indication that the trial court recognized the harm in placing Hoyt in Ms. Moss' custody. Thus, we find the trial court's grant of custody to Ms. Moss was an abuse of discretion, and we reverse. We award primary, domiciliary custody to Mr. Goodger. We grant Ms. Moss visitation on the first, second, and fourth weekends of each month, beginning at Thursday at 6:00 p.m., until Sunday at 6:00 p.m. Thanksgiving, Christmas, and Easter holidays will be split equally into pre- and post-periods. During the 2012 periods, Mr. Goodger will have the pre-period; those will alternate each year. The person who has custody will bring Hoyt to the other individual's home by 6:00 p.m. Ms. Moss will receive full visitation two weeks during the summer at a time to be determined by the parties. We remand this matter to the trial court for an assessment of child support to be paid by Ms. Moss to Mr. Goodger.

IV.

## CONCLUSION

For the reasons articulated above, we reverse the judgment of the trial court and remand the matter for an assessment of child support. Costs of this appeal are assessed against Appellee, Carolyn Moss.

**REVERSED AND REMANDED.**