STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

16-926

KIMBERLY HENSGENS GUINN

VERSUS

NATHANIEL STUART GUINN

**********
APPEAL FROM THE
THIRTY FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-398-14
HONORABLE STEVE GUNNELL, DISTRICT JUDGE
**********

SYLVIA R. COOKS
JUDGE

**********

Court composed of Chief Judge Ulysses Gene Thibodeaux, Sylvia R. Cooks, and Elizabeth A. Pickett, Judges.

AFFIRMED.

Evelyn M. Oubre
522 Clarence Street
Lake Charles, LA 70601
(337) 436-0337
ATTORNEY FOR PLAINTIFF/APPELLANT:
  Kimberly Beth Hensgens Guinn

Tim Cassidy
P.O. Box 1446
Jennings, LA 70546
(337) 824-7322
ATTORNEY FOR DEFENDANT/APPELLEE:
  Nathaniel Stuart Guinn

**COOKS, Judge.**

Kimberly Beth Hensgens Guinn (Kimberly) filed a petition for divorce from Nathaniel Stuart Guinn (Stuart) on June 25, 2014, in which she prayed for joint custody of their three minor children.[1] The three children are ages ten (M.K.G), eight (N.S.G.) and six (G.E.G.). She also asked to be named domiciliary parent with Stuart to have reasonable access to the children. Stuart filed an answer and reconventional demand on July 18, 2014 seeking joint custody and equal access to the children by both parents. On August 12, 2014, the parties appeared in open court and entered into the record a consent agreement on custody and visitation. The parties agreed to joint custody with Kimberly named as domiciliary parent. The agreement set forth an express schedule of visitation for Stuart covering the immediate future but left summer visitation "to be determined later." The trial court instructed Kimberly's attorney to prepare a judgment based upon the stipulations and directed Stuart's attorney to prepare a "standard joint custody implementation plan." The agreement also provided that neither party engage in any activity to alienate or adversely affect the children and provided "alternating holiday periods according to the school calendar." Neither party filed any judgment or implementation plan with the trial court.

On November 5, 2014, Stuart filed a motion and order in which he asserted that the stipulation made in court on August 12, 2014, had never been reduced to a signed judgment. He attached a proposed implementation plan and a proposed judgment, and sought a new court date for a hearing to determine custody and visitation of the three children. Two days later, November 7, 2014, Kimberly filed

---

[1] Unlike many district courts in this circuit, the 31st Judicial District Court for the Parish of Jefferson Davis has only one judge and has no hearing officers, thus, the trial judge in this case presided over all conferences, hearings, and trials in this case.

a motion to modify and/or clarify custody and visitation. She, too, asserted the stipulation of August 12, 2014 was not reduced to writing and she further alleged Stuart's proposed judgment and proposed implementation plan did not conform to the agreement made in open court. Kimberly asserted the two proposed documents "expands to areas/issues not stipulated to by the parties nor raised in any pleading to date." Kimberly sought to have the trial court adopt a joint custody plan.

Stuart and Kimberly once again appeared in court on December 16, 2014. According to the court minutes, following a pre-trial conference with the parties and their attorneys present, the trial court entered an order on the record, in open court. The court minutes reflect that: *"Both parties are present in the Courtroom and state that they have heard the stipulation, understand it and agree to it"* (emphasis added). The judgment, signed on December 30, 2014, provided for joint custody of the minor children "with the parties having such custodial privileges and Christmas Holiday visitation, *as specifically stated by and acknowledged by both parties in Open Court, this date,* pending further order of this court" (emphasis added). The judgment also ordered that neither party "shall allow Paul Douglas Blank (Doug) to have any contact whatsoever with the minor children of the parties, pending further order of this Court." The parties were also ordered to mediate the issues of custody and visitation and to develop "an appropriate Joint Custody Implementation Plan." The trial court continued all pending rules without date "pending the completion of the mediation hearing."

Stuart next filed a petition on rule on April 28, 2015, alleging Kimberly was in contempt of the court's ruling by allowing contact between the minor children and Doug six different times from March 14, 2015 to April 16, 2015. Stuart also prayed to be made domiciliary parent of the minor children and that the children be

permitted to continue living in Jennings.

Kimberly and Stuart next appeared in court on May 5, 2015. The trial court set a date for hearing because the effort at mediation failed. The trial court refused Kimberly's request to remove the prohibition previously put in place forbidding Doug from being in the presence of the parties' minor children. The trial court emphasized that the prohibition was "the Court's order." Kimberly and Doug share a child out of wedlock born prior to her marriage to Stuart, and they have a child recently born out of marriage during the pendency of these proceedings. Kimberly and Doug were romantically involved before Kimberly met Stuart, and, when this child was almost a year old, Doug was incarcerated for seven years. Stuart raised this child as his own and has remained emotionally attached to the child. Kimberly and Doug do not permit Stuart to visit with this child.

Kimberly next filed a "Motion and Order to Amend Existing Orders" asking the court to allow the children to be in Doug's presence because she was about to give birth to another child, fathered by Doug, and alleging Doug had received "in-house substance abuse treatment" with "continuing follow-up treatment." Attached to Kimberly's motion, in support of her contentions, was a written report by Eddie Windham, LCSW. The report includes a history of Doug's drug abuse up to June of 2015, which we will discuss at length later.

On April 7, 2016, the trial court rendered judgment in the matter awarding joint custody of the three minor Guinn children to Stuart and Kimberly, and naming Stuart the domiciliary parent of all three children. Kimberly was awarded visitation on alternating weekends and every other Wednesday. Major holidays are to be alternated between Stuart and Kimberly "with the understanding that these holidays shall take precedence over the visitation custodial schedule." The trial

court terminated interim periodic spousal support to Kimberly and, further found Kimberly was not free from fault in the breakup of the marriage. The judge denied her claim for periodic final spousal support. The rule for contempt filed by Kimberly against Stuart also was denied. Stuart's rule for contempt filed against Kimberly was granted. Kimberly was held in contempt of the court's order prohibiting her from allowing the children to be in Doug's presence. The trial court only issued a warning to Kimberly admonishing her not to disobey the court's order in the future. The trial court issued written reasons for its ruling stating "the Court finds at this time it is in the best interest of the minor children to live with their father." Kimberly's motion for new trial was denied. Kimberly appeals the judgment of the trial court asserting the trial court erred in:

1) Naming the father [Stuart] as the domiciliary parent, and granting the mother only limited visitations instead of equal time sharing between the mother and her children.

2) Finding the mother in contempt of a previous order denying all contact between the children of this marriage and the father of two of her other children.

## LAW AND ANALYSIS

Kimberly asserts that the judgment rendered in open court on December 16, 2014, and later reduced to writing, is not valid because "there was no testimony presented; no evidence produced; and no stipulations offered; only a pre-trial conference was held." We first note that Kimberly's present counsel was not her attorney at this appearance. She was represented at that court appearance by Mr. Joshua Guillory. Kimberly's current representation that "no stipulations [were] offered" at the hearing on December 16, 2014, is simply not true. The minutes clearly reflect that the judge stated in open court, on the record, that both Kimberly and Stuart were present in the courtroom and that both "state that they heard the

4

stipulation, understand it and agree to it." Likewise, the judgment signed on December 30, 2014, recites in the opening paragraph (emphasis added) :

> Present were Kimberly Hensgens Guinn and her attorney, Joshua S. Guillory; and, Nathaniel Stuart Guinn and his attorney, Tim Cassidy. Considering the record of these proceedings, the arguments of counsel and **the stipulations of the parties made in open court** this date, the law and evidence being in favor thereof. . ."

The transcript of the proceeding also reflects that both parties and their attorneys were present in court and recites that much was discussed in chambers to reach the understanding of what was being placed on the record. The trial judge asked both parties to confirm their own understanding of what was being made the order of the court. Both acknowledged they understood. Neither the parties nor their attorneys disagreed with any of the recitations being made by the trial judge. As the minutes reflect, all present acknowledged that "the matter was discussed in Chambers." The particulars of the agreement reached in chambers, which the trial judge recited on the record, and the parties individually acknowledged they understood, included the following:

> The court orders both parties to mediation with Judge Ronald D. Cox. In the interim, while the children are in the custody of Mrs. Guinn, Mr. Paul Douglas Blank cannot be present. Costs of mediation will be born (sic) by the parties. A mutual restraining order will issue against both parties from alienating or disposing of community property. Mr. Guinn was allowed to enter into the community savings to pay certain bills. Mr. Guinn can enter that account to retrieve $800.00 to pay for mediation with Judge Cox. The custody agreement will remain in place. Counsel advise the Court that the minutes do not reflect everything that was discussed; it was hand crafted. A joint custody implementation plan will be prepared. Temporarily, joint custody of every other weekend will remain in place. Mr. Cassidy will prepare the judgment. The parties will schedule mediation within 30 days. Counsel advise the Court that holiday visitation should be okay with no problems. Mrs. Guinn will have the Friday from school to Christmas as 5 P.M. Mr. Guinn agrees. Mr. Guinn will withdraw Christmas monies from the community funds.

Both the judgment and the transcript of the proceeding contained in this

record reflect the same provisions and acknowledgment of understanding by the parties and their lawyers as succinctly set forth in the court minutes. Reviewing all three documents made part of this record it is clear that the parties stipulated to the judgment recited in open court on December 16, 2014. We therefore reject Kimberly's assertion that this judgment is invalid.

Kimberly asserts, alternatively, that even if the judgment signed on December 30, 2014 is valid, she is not guilty of contempt because her actions "did not constitute an indirect contempt." She asserts that 1) only she testified to the facts concerning contact between the children and Doug; 2) "the encounters [between Doug and the children] were nothing but innocuous events with *no intent* to defy the court; and 3) as to one of the admitted encounters between one of the children and Doug the child did not actually see Doug because "Kimberly told [Doug] to go to a bedroom" while the child went to the bathroom.

Based upon our thorough review of the record we find the trial judge did not abuse his discretion in finding Kimberly in contempt of his express order. Kimberly's admissions, in her deposition and later in court, would alone be sufficient to establish she knowingly and willfully violated the court's order prohibiting contact between her and Stuart's minor children and Doug. Stuart's testimony provides additional strong support for the trial court's ruling as does Mr. Windham's report.

In *Garcia v Garcia*, 10-446 pp. 4-5 (La.App. 3 Cir. 11/3/10), 49 So.3d 601, 605 this court recapped our law on contempt in a child custody matter:

> Louisiana Code of Civil Procedure Article 221 defines contempt of court as "any act or omission tending to obstruct or interfere with the orderly administration of justice, or to impair the dignity of the court or respect for its authority. Contempts of court are of two kinds, direct and constructive[.]" Pursuant to La.Code Civ.P. art. 224(2),

6

constructive contempt is "[w]illful disobedience of any lawful judgment, order, mandate, writ, or process of the court." Constructive contempt "must be based on a finding that the accused violated an order of the court 'intentionally, knowingly, and purposefully, without justifiable excuse.' " *Lang v. Asten, Inc.,* 05–1119, p. 1 (La.1/13/06), 918 So.2d 453, 454 (quoting *Brunet v. Magnolia Quarterboats, Inc.,* 97–187, p. 10 (La.App. 5 Cir. 3/11/98), 711 So.2d 308, 313, *writ denied,* 90–990 (La.5/29/98), 720 So.2d 343). "A trial court is vested with great discretion to determine whether a party should be held in contempt for willfully disobeying a trial court judgment." *Barnes v. Barnes,* 07–27, p. 9 (La.App. 3 Cir. 5/2/07), 957 So.2d 251, 257 (citing *Fink v. Bryant,* 01–987 (La.11/28/01), 801 So.2d 346).

In her deposition testimony Kimberly stated:

Q. The ban, have you violated that ban a time or two?

A. Yes, I did.

Q. Why did you do that?

A. Why did I do that? Because how do you tell a five-year-old, a seven-year-old, and an eight-year-old - - or nine-year-old, excuse me, you cannot tell this person hello, do not talk to this person? They don't understand.

Q. But the judge gave you a direct order and –

A. You're right. He did.

Q. He said no contact whatsoever.

A. He did. And then Doug and I also share a child together which makes it very difficult.

Q. And so Doug was aware of the order and you were aware of the order and ya'll violated it?

Object. As far as Doug goes, she doesn't know what Doug was thinking, but you can ask her.

Q. Well, was Doug aware of the order?

A. Yes.

Q. And so - - and you were aware of the order?

A. Yes.

Q. And you violated it anyway?

A. Yes, I did.

Q. Do you find that to be anti-authority behavior on the part of both of you?

. . . .

A. Yes.

. . . .

Q. But the other day when we were at court – and I don't know – it wasn't with your first lawyer; it was with your second one, Mr. Guillory, and we went to court. It was right before you terminated Mr. Guillory's services. And we went to court, and on the way out, Doug ran down the stairs and he was mad and he was kind of going to get him [Stuart] and a deputy had to go and kind of stop him. Do you know about that incident?

A. Yes, I do.

Q. And, again, does Doug have an aggressive personality? Is that something that just pops up every now and then? Is it –

A. Well, when you - -

Q. Something he works with every day?

A. - - when you hear that the judge made a statement saying if he finds me in contempt, pregnant or not, he will put me in jail. And sitting and watching what he has done to me and those children, it's very hard to keep control of your emotions. And sometimes you do - - he stopped. He wasn't going. It was just a reaction.

Q. A reaction that - -

A. I wanted to - -

Q. Do you think that was also indicative of anti-authority-type behavior?

A. I believe that he would do the same thing.

Q. Okay.

A. Because he has done it.

8

When Stuart was deposed he related the following concerning his knowledge and experience with Doug:

Q. Tell me why he can't be around the kids.

A. His record. Simple.

Q. His record of what?

A. His record of past substance abuse, his attitude throughout this whole divorce proceeding.

Q. Tell me about his attitude.

A. He's very manipulative, he's very aggressive. You know, aggressive to the point where even in Mr. Wyndham's (sic) report, he – he fired rounds into a home to get even. He is a narcissist. I don't know if him being around the kids if there was any – you know, it's either him or the kids. I don't necessarily think it would be to the kid's best interest. I think he would definitely take care of himself. I think that's quite obvious in his past record. I mean, he had a child and went off on a criminal tangent and got put away for seven or eight years while he had a newborn infant around.

Q. Do you know what that seven or eight year sentence was for?

A. I did not exactly know the details of it until I actually read that report. I knew it had something to do with drugs and weapons. That's the extent that I knew.

Q. Do you have any reason to think that he has been using drugs in the last year or so?

A. I've had some incidents where he came to my home right when Kim and I had split up that I definitely thought there was something not right with him. He went on and talked about times when he was suicidal, had a shotgun in his mouth. And then Kim and I had a[n] argument that was basically initiated by her having to do with a pet day at school when it's Kim's time but I'm bringing pets to school for the children to have at pet day. So we go to my brother's home. We're on the phone and –

Q. "We"? You and Kim?

A. Kim and I are on the phone and five minutes later, he shows up in a very aggressive manner at my brother's home which he never has been to, does not know where he lives. And I had my children with me. I was outside and my brother was outside and he did not look like

9

he was a normal guy wanting to visit. He was very aggressive, very outspoken. Parked on the road and stormed down the driveway. And then our last court case – our court hearing that we had, he actually was in a – that same hurried pace chasing me outside the courtroom hollering my name enough where a deputy had to be dispatched to go and stop him.

Q. Is that what you mean when you say "aggressive"?

A. That is what I mean when I say "aggressive."

In addition to Kimberly and Stuart's testimony, the record also contains Mr. Windham's report which sets forth a comprehensive examination of Doug. Doug's criminal history began in high school. His adult criminal record began just two years after high school when in 2000, "after a night of drinking whiskey and using cocaine[,] he drove" to his landlord's home and fired a sawed-off shotgun five times at their residence and vehicle. He was charged with "six counts of attempted first degree murder, possession of an illegal firearm, illegal discharge of an illegal weapon and aggravated criminal damage to property." The "attempted first degree murder charges were dismissed in a plea deal," and Doug received a "felony conviction with five years supervised probation, community service, anger management and substance abuse treatment." But before that five year period ended Doug was sentenced in 2004 to serve seven (7) years in prison as the result of a felony conviction. According to Doug's account of that episode:

> [H]e was arrested in Jeff Davis Parish in 2004 for possession of a firearm by a convicted felon. Doug stated that [he] was driving in a car with two females and that a male friend and two more females were following him in another car. Doug stated that all six of them had been using meth [methamphetamene] together for several days. Doug stated that they were all going to the home of Doug's aunt in Welsh. Doug stated that one of the females in the other vehicle called Doug and told him to pull over to give her more meth. Doug stated that he told her to wait until they got to this aunt's home. He stated that the girl became angry and called her uncle who worked for the Jeff Davis Parish Sheriff's Department. Doug stated that the girl told her uncle that Doug tries (sic) to run the vehicle that she was riding in

off the road. Doug stated that he was pulled over by sheriff's deputies a short time later. Doug stated that after being pulled over he admitted to the deputies that [he] had a semi-automatic handgun (a Tech 9) in the vehicle. Doug stated that he was still on probation from his felony charges from 2000 in Washington Parish. Doug stated that he was (sic) served seven years in prison due to the new charge and probation violation. Doug stated that he was released from prison on February 22, 2011. Doug reported that he completed three years of parole after his release.

*Having just completed his three years on parole*, Doug was again arrested "in late July or early August 2014, for illegal use of a weapon in Lafayette, L[ouisiana]." He received a sentence of two years unsupervised probation for that charge. *One day after this arrest in Lafayette*, Doug "was arrested in Lake Charles at a hotel for possession CDS-2 (meth and steroids)." According to him this arrest happened because he was trying to help an old friend. He recounted the details of this latest episode as follows:

> [A]n old female classmate called him and was 'freaking out' after using meth. Dough stated that the friend believed she was having a heart attack. Doug stated he met his friend in Jennings and drove her to Lake Charles. Doug stated that he had been drinking prior to the meeting with his friend. [He] stated that he continued drinking and was intoxicated by the time they arrived in Lake Charles. [He] stated that he and the friend checked into a local hotel. [He] fell asleep and the friend began panicking again (believing she was having a heart attack). Doug stated that she called 911 for help. [He] was arrested when (sic) for possession after law enforcement came to the room and found his drugs.

According to Doug, he posted bond the next day and believed he would be placed on a diversionary program. The record contains no further information on the outcome of this latest reported offense. These latest charges once again involve weapons, which Doug was not supposed to have in his possession, and involve further use of methamphetamines. These events occurred at the same time Doug and Kimberly had renewed their relationship, and at the same time Stuart and Kimberly were fighting in court about custody and visitation of their children.

11

Doug admits to an alcohol problem since the age of fifteen (15); marijuana use since the age of fifteen (15); and a methamphetamine problem since the age of twenty-four (24). He also told Mr. Windham that he has used "pretty much whatever [drug] was available." Kimberly too, admits to past drug use, including methamphetamines, but asserts that she and Doug have never done drugs together, and that she has never witnessed Doug doing drugs. She also says she started seeing Doug immediately after he got out of prison but denied renewing a romantic involvement with Doug until after she and Stuart separated. Stuart maintains that Kimberly and Doug were having a romantic involvement early on after his release from prison and that such was in part to blame for the breakup of their marriage. Again Kimberly's testimony in court is very revealing on the subject of Doug Blank.

> Q. How often were you seeing Doug Blank six months prior to you filing for a petition of divorce which was in June '14? How often were you seeing Mr. Blank?
>
> A. I guess every other weekend or I'm not quite sure.
>
> Q. Well, you were totally disgusted with your husband, Mr. Guinn, so when did you become romantically involved with Mr. Blank again? Certainly before you filed the petition?
>
> A. No.
>
> Q. No?
>
> A. No.
>
> Q. Yet you got pregnant for him just a couple months after you filed the petition; it that correct?
>
> A. Correct.
>
> Q. And you're an LPN; correct?
>
> A. Yeah.

Q. You do know how to avoid pregnancies, don't you?

A. Sure.

Q. So you planned this pregnancy?

A. No, it was not planned.

Q. Oh. So you're here telling the Court that you had no romantic interest with Mr. Blank prior to filing your petition?

A. Correct.

Q. So when [did] the romantic interest start, the day after?

A. No, sir.

Q. You're seeing him several times a week every week for the whole, you know, since January 1st of 2014, six months before you file for divorce. You're already agitated with your husband because you think he's verbally abusive and you're telling me you didn't have any romantic interest in Mr. Blank during that time?

A. That's correct.

Q. You're telling me that Mr. Blank, in your little relationship with Mr. Blank, did not cause a demise in your marriage?

A. No, sir.

Q. And y'all had no arguments about it?

A. Stuart and I?

Q. Yes.

A. Yes, we had arguments about that, yes.

Q. Yeah, a lot, huh?

A. Yes sir.

Q. And he wanted you to go to marriage counseling; didn't he?

A. Yes.

Q. And you refused didn't you?

A. Well, I was advised by my counselor –

Q. Yes or no, you refused?

A. Yes, I did, yes.

Q. Okay. After you filed for the divorce, and I would guess there was a period of time before we came to court for the first time in August and in August I think you were represented by Mr. Burleigh Doga; is that correct?

A. Correct.

Q. Okay. And when we came to court in August at that time, prior to that time, had Stuart been asking you not to allow the children to be around Mr. Blank?

A. Correct.

Q. Okay. Do you know why he didn't want the children to be around Mr. Blank?

A. I could assume why.

Q. But you don't know why?

A. Well, he would tell me why but I have a different why I think he said.

Q. Well, did you read Mr. Windham's report that y'all had done with Mr. Blank? Did you read Mr. Eddie Windham's report?

A. Yes, I did.

Q. Did you see in there where Doug was on drugs all the way up through August of '14?

A. Yes.

Q. So all the time he was on drugs and Stuart [was] fussing about this and you paid him no mind? I mean, you said no. You didn't think Doug was a threat to the children or a problem. How can you justify that?

A. How can I justify that?

Q. Yes.

A. Because I believe that I am responsible enough as a mother that if my kids were put in any kind of danger that I would take them away

14

from that.

Q. Okay. And then Mr. Blank made an attempt at going to a rehab sometimes at the Home of Grace but he didn't complete that program; correct?

A. Correct.

Q. He checked out; correct?

A. Correct.

Q. He also got arrested for two felony arrests in the month of August, is that correct?

A. He has never gotten charged.

Q. He got arrested; correct?

A. He did get arrested, yes, sir.

Q. In Calcasieu Parish.

A. Yes.

Q. With some drugs and also in Lafayette Parish; correct?

A. Correct.

Q. Now, you're pregnant with his child now and you're telling him no; is that correct? You're telling him no you're going to have a relationship with Doug Blank and you don't care. That's what you were telling him?

A. After Doug got out of rehab? Yes.

Q. Yeah, just walked out of rehab. He didn't complete rehab.

A. No, he did not complete rehab. He's in another treatment.

Q. Well, at the time he didn't complete his treatment program at Home of Grace, no?

A. No.

Q. No. He walked out of that, he didn't complete it.

A. For his own reasons.

15

Q. Okay, so here's a man who's admitted that he's on drugs, who walks out of treatment, who's been in prison for seven years and has a multiple arrest record and convictions, and you're telling the father of these three children that no, I think Mr. Blank's as asset to these children and I want him to be able to see all of my children. How do you justify that?

A. Well, Doug Blank was not a problem when Stuart and I were together and we would have Sunday dinners at Doug's parent[']s house.

Q. After you filed the divorce, was there Sunday dinners at the parent's house?

A. Sunday dinners.

Q. Sunday dinners all the way until December when we had to file an order, a stay away order.

A. Right.

It was later established during Stuart's testimony that he did not have Sunday dinners with Kimberly and Doug's parents. Kimberly's attorney made it clear that Kimberly was not referring to Stuart in her response to his attorney's question despite both the judge and Stuart's attorney's understanding to the contrary. Stuart verified when he testified that he did not have Sunday dinners with Doug's parents as Kimberly had stated.

Kimberly then explained that her daughter with Doug lives in Crowley with Kimberly's parents where she attends Catholic school. Although this child is not Stuart's child he had always paid her tuition to Catholic school just as he did for his own children. Stuart testified he treated this child as his own having raised her as a father since she was a year old. According to Kimberly, when she left Stuart she and Doug got together and no longer allowed Staurt to see the child. This is when Stuart stopped paying her tuition. At that point the child was living with her grandparents. Kimberly's sister began paying the tuition because, according to

16

Kimberly, neither she nor Doug could afford to pay the child's tuition. At some point later, according to Kimberly, Doug began helping her sister to pay the child's tuition and she continued to live with her grandparents.

Stuart had an entirely different understanding concerning Kimberly and Doug's romantic involvement, and Doug's fitness to be around Stuart's children. When asked about the months leading to their physical separation and Kimberly's filing for divorce Staurt testified as follows:

> Q. Okay. In the months preceding that [the filing of the petition for divorce] was she having more and more frequent contact with Mr. Blank?
>
> A. To my knowledge, yes.
>
> Q. Okay. At any time during that period did she tell you, you know what, it's over and I don't love you anymore?
>
> A. Yes.
>
> Q. Did she tell you that more than once?
>
> A. She told me that on numerous occasions.
>
> Q. Did she ask you to leave?
>
> A. She asked me to leave on numerous occasions.
>
> Q. Okay. And did you in fact leave?
>
> A. I did not until she left and when she left I decided that it would be better for the kids to not be disrupted so I told her I would leave.
>
> Q. Okay. And so she moved back into the house.
>
> A. She never moved out. She just—for the weekend getaway.
>
> Q. Okay. And so you agreed to move then.
>
> A. I told her that for the kids['] sake I would leave.
>
> Q. Okay. And then you moved to your parent's house. At some point in time we went to court, maybe it was a few months after that in August of 2014, do you remember that?

A. Yes.

Q. Okay. And do you remember coming here and trying to work out a joint custody agreement type plan?

A. I do.

Q. Let's talk about that a little bit. At that point I time, you became very adamant about Mr. Blank not being involved in your children's lives; is that correct?

A. I was adamant about that two months prior whenever actually he showed up at the home whenever Kim wasn't there and I had my son and nephew, my brother Will's son, and it was about 10:30 at night unannounced visit, somebody knocking on the front door and I had a conversation with him. I don't really know of his reason to show up. He was saying that Kim and I's arguing was affecting his daughter and he wanted to visit about it. So I invited him in, the boys were sleeping. We visited about it. And I noticed something wasn't right, you know. Coming from that conversation that we had that he was on a rant. He told of times that he was, you know, talked about drugs, talked about times he wanted to commit suicide, just very distraught in my opinion.

I was quizzing him as to his relationship or his interaction with Kim and at first he denied it, but then after a few minutes of the conversation it was apparent that they had been having interactions, apparent. I actually think that Kim may have sent him over there. I'm not sure. I'm not sure. But after that conversation I suspected him to be on some type of substance. I suspected it. I [did] not know of his full past. I knew that he had done prison time for weapons and drugs. I didn't know the whole extent of it. I knew what information I gathered from Kim which wasn't the full story. I don't have to assume that he was on drugs at that particular point [in] time. Mr. Windham's report that was filed said that he was on drugs for four months in the summer of 2014 prior to his arrest in August.

. . . .

A. I asked her from that particular instance that I just testified to is when I started asking her for the kids not to be around him and I've asked her—I pleaded with her. I said I do not want them around him and the more I would ask her the more she would go to the opposite direction.

Q. Okay. And that's what resulted in filing the stay away order that was put in place in December of 2014; correct?

18

A.  That is correct.

As we have previously set forth, Mr. Windham's report on Doug wholly substantiates Stuart's observations and conclusions.  The report chronicles Doug's lifetime addiction to drugs and alcohol use and the violent behavior he has engaged in when under the influence of drugs and alcohol.   Mr. Windham's report confirmed Stuart's opinion that Doug was again using drugs right up to the time Stuart and Kimberly went to court.   Mr. Windham concludes in his report that Doug has "a high probability of having a Severe Substance Use Disorder."  He also found Doug now acknowledges his drug use and recognizes the negative consequences of his drug habit and the negative consequences of his loss of control when using alcohol and/or illicit drugs.   After interviewing Doug, Kimberly, and their daughter, and after administering a variety of tests, Mr. Windham concluded he does not believe Doug needs any anger management or domestic violence treatment. He summed up his opinion about Doug in this way (emphasis added):

> Doug has no concerning or abnormal history of abusive or violent behaviors *while sober and drug-free*.  Although his violent behavior in Washington Parish was extreme I believe it was a very isolated and drug induced incident.  When considering the amount of time that Doug has abused alcohol and drugs during his life that this was the only reported or documented violence by Doug while he was impaired by drugs indicates that Doug is not normally violent or highly aggressive.  Alcohol and drug abuse lowers inhibitions and often leads to people doing things that they would like to do but restrain themselves from doing sober.  *Alcohol and drugs tend to cause an increase in violent and abusive behaviors in people who are predisposed to violence.*  I believe that if Doug had a violent and abusive nature he would have committed many more acts of violence while impaired.  I also believe that he would not have "disappeared" or avoided being around people that he cares about when he was using drugs if he were predisposed to committing violence.  I believe that there is a minimal and less than average risk of Doug harming Kimberly, [E.B.], or Kimberly's other children.
>
> *I do recommend that Doug continue to work on his recovery from drug addiction.  Doug needs to participate in outpatient*

19

*substance abuse treatment with a substance abuse counselor or a therapist with experience treating substance abusers.*

The trial court found Kimberly was at fault in the breakup of the marriage, apparently based on its determinations of credibility regarding Kimberly and Stuart's testimony. We cannot say the trial court abused its discretion in this regard and note that the trial judge was in the better position to make this determination. Further, after considering all of the testimony, having observed the demeanor of the witnesses and the behavior of Doug throughout the proceedings, the trial judge concluded that Kimberly's actions violated the court's contempt order. We cannot say the trial judge abused his great discretion in reaching that conclusion. Kimberly not only violated the order multiple times but she admits that she has little regard for the order and remains unwilling to accept the fact, or reasons therefor, that the court has prohibited contact between Doug and the Guinn children. It is noteworthy that Doug's two children with Kimberly do not reside with him, and their oldest child does not reside with Kimberly but instead lives with her parents who do not allow Doug in their home. The trial court also provided in the judgment that: "all visitation with the minor children, when in the presence of Paul Douglas Blank, shall, at all times, be supervised by a competent adult.

Kimberly asserts the trial court erred in naming Stuart domiciliary parent and in "granting [Kimberly] only limited visitations instead of equal time sharing between the mother and her children…" We have already determined that the first stipulated agreement regarding custody was a valid consent judgment. It was not a considered decree. Therefore, the "party seeking the modification of custody must prove that there has been a material change in circumstances since the original

decree as well as prove that the proposed modification is in the best interest of the child. *Aucoin* [v. *Aucoin*, 02-756 (La.App. 3 Cir. 12/30/02)] 834 So.2d 1245."

*Moss v. Goodger*, 12-783 p. 5 (La.App. 3 Cir. 12/12/12), 104 So.3d 807, 811. When reviewing child custody determinations we review the facts presented in the record in order to determine the reasonableness of the trial court's findings.

> The trial court is in the best position to ascertain the best interest of the child which is the paramount consideration in determining child custody. La.Civ.Code art. 131; *Evans v. Lungrin,* 97–541 (La.2/6/98), 708 So.2d 731. Accordingly, the trial court's determination regarding child custody is entitled to great weight and will not be disturbed on appeal absent a clear abuse of discretion. *Aucoin v. Aucoin,* 02–756 (La.App. 3 Cir. 12/30/02), 834 So.2d 1245. A trial court's determination of a child's best interest is usually based heavily on factual findings. *Henry v. Henry,* 08–689 (La.App. 1 Cir. 9/23/08), 995 So.2d 643. It is well settled that an appellate court cannot set aside a trial court's factual findings in the absence of manifest error or unless the findings are clearly wrong. *Rosell v. ESCO,* 549 So.2d 840, 844 (La.1989). In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record clearly establishes that the fact finder is clearly wrong or manifestly erroneous. *Stobart v. State, DOTD,* 617 So.2d 880, 882 (La.1993). If the trial court's findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced it would have weighed the evidence differently had it been the trier of fact. *Rosell,* 549 So.2d at 844. An appellate court, however, is not compelled to slavishly rubberstamp a trial court's finding. *See, Butler v. Zapata Haynie Corp.,* 92–71 (La.App. 3 Cir. 2/23/94), 633 So.2d 1274, *writ granted in part, judgment amended by,* 94–1171 (La.7/5/94), 639 So.2d 1186, *cert. denied,* 513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 494 (1994). Indeed, an appellate court is constitutionally mandated to review facts. *Ambrose v. New Orleans Police Dep't Ambulance Serv.,* 93–3099 (La.7/5/94), 639 So.2d 216.

*Moss,* 104 So.3d at 810–11.

Our review of this record discloses the trial court's findings are reasonably supported by the facts and are not manifestly erroneous. The trial court's finding Kimberly in contempt of its ruling barring contact between Doug and the Guinn children takes on added significance in this matter. Louisiana Revised Statute 13:

4611 provides in pertinent part: "A pattern of willful and intentional violation of this Section, without good cause, may constitute a material change in circumstances warranting a modification of an existing custody or visitation order." We have already determined that the trial court's ruling in this regard is well-supported by the record. The trial court emphasized to Kimberly the importance of obeying this order yet she willfully disobeyed. Kimberly has shown that she has little regard for the trial court's order prohibiting contact between Doug and the Guinn children. She admitted to repeated violations of the order, but more importantly, she admits to her unwillingness to see the need for such order. She also demonstrates a lack of mature responsibility as the adult in the room where this prohibition is concerned, and instead explains her willful behavior by asking the court how it can expect these young children to understand the reasons for this prohibition. It is not necessary that these young children grasp the importance of the court's order. It is, however, necessary that Kimberly understand the need for this order and understand that she must respect the court's order based on its finding of what is in the best interest of her children. It is this admitted lack of understanding and demonstrated lack of respect for authority that has lead the trial court to its conclusions. It seems Kimberly places her romantic, or romanticized, feelings for Doug ahead of the welfare of her minor children. The trial court was in the best position to make the difficult determinations of credibility of the witnesses who testified in this matter, and we cannot say, after a thorough review of the record, that those determinations indicate any abuse of the trial court's discretion much less find any manifest error in the trial court's ruling.

Stuart's testimony is convincing and is buttressed by Kimberly's own testimony and other witnesses, as well as by other evidence including Mr.

22

Windham's report. Doug's longstanding drug use is worthy of consideration especially in light of his behavior when these proceedings began. Troubling, too, is Kimberly's history of drug use especially when coupled with her history concerning Doug. She has chosen to continue her association with Doug, and when he was released from prison she chose a renewed intimate involvement with him over her marriage and family which quickly led to the birth of another child for Doug. As of the latest court appearance Kimberly has no plans to marry Doug and has made no progress toward employment or housing. Stuart demonstrated a change in circumstances that warranted the court making him domiciliary parent. The trial court maintained joint custody but placed more limitation on Kimberly's visitation which we cannot say is unreasonable considering the facts presented. In its reasons for judgment the trial court chronicled the nonexclusive factors listed in Louisiana Civil Code Article 134 that it considered in determining what would be in the best interest of these children, to wit:

> [T]he love, affection, and other emotional ties between each party and the child; the capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs; the moral fitness of each party insofar as it affects the welfare of the child; the mental and physical health of each party, and the willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

The trial judge was in the best position to apply these and other factors in making these determinations. Our review of the entire record reveals the trial court could reasonably reach its conclusions and we find no manifest error in its rulings.

The costs of this appeal are assessed against Kimberly Hensgens Guinn.

**AFFIRMED**.