# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 17-722


PHILLIP VIDRINE

VERSUS

DANIELLE VIDRINE


**********

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 74286-B
HONORABLE RONALD D. COX, JUDGE AD HOC

**********

## JOHN E. CONERY
## JUDGE

**********

Court composed of Sylvia R. Cooks, Marc T. Amy, and John E. Conery, Judges.

**Amy, J, concurs in the result and assigns separate reasons.**

**REVERSED AND RENDERED.**

**Gabe A. Duhon**
**Attorney at Law**
**Post Office Box 478**
**Abbeville, Louisiana  70511**
**(337) 893-3423**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Phillip Vidrine**

**Anthony Jerome Fontana, Jr.**
**Attorney at Law**
**210 North Washington Street**
**Abbeville, Louisiana  70510**
**(337) 898-8332**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Phillip Vidrine**

**Kenneth Ray Rush**
**Attorney at Law**
**Post Office Box 704**
**Oakdale, Louisiana  71463**
**(318) 335-2759**
**COUNSEL FOR DEFENDANT/APPELLEE:**
     **Danielle Vidrine**

**CONERY, Judge.**

In this child custody modification case, the father appeals a judgment maintaining the parties' prior consent judgment on custody (the judgment) and joint custody implementation plan (JCIP), asserting the trial court abused its discretion when it failed to find a material change in circumstances warranting modification of the judgment and JCIP. The father specifically requests that he be named domiciliary parent and that physical custodial periods be modified from an alternating fourteen-day rotation. For the following reasons, we find that the trial court's factual finding that there was not a material change in circumstances is unsupported by the record and was an abuse of the trial court's discretion. We further find that the trial court committed legal error when it failed to recognize that the re-marriage of the father constituted a change in circumstances as provided in the parties' prior consent judgment and when it failed to designate a domiciliary parent. After reviewing the record de novo, we find that material changes in circumstances occurred and modification of the parties' prior custody judgment is in the minor child's best interest. We reverse the trial court's judgment and render judgment in favor of the father maintaining joint legal custody, naming the father domiciliary parent, and modifying the parties' physical custodial schedule.

## PROCEDURAL HISTORY:

Phillip and Danielle Vidrine were married in 2008 and are the parents of one child, E.V., who was born on October 30, 2009. Mr. Vidrine filed a petition for divorce in accordance with La.Civ. Code art. 102 on August 15, 2013.[1] Shortly thereafter, the parties confected an agreement on custody, which was reduced to

---

[1] The parties were divorced on September 16, 2014.

writing and signed as a consent judgment by the trial court on September 9, 2013.[2] In the stipulated custody judgment, the parties agreed to joint legal custody of E.V. and co-domiciliary status, with each parent serving as the domiciliary parent during their respective physical custodial periods. They further agreed to share physical custody on a fourteen-day rotation to coincide with the father's then offshore employment schedule.

The initial pleading giving rise to this appeal was Mr. Vidrine's November 6, 2015 rule for emergency ex-parté custody pursuant to La.Code Civ.P. art. 3945, and to modify legal and physical custody of E.V.[3] Mr. Vidrine alleged that he should be granted temporary sole custody of E.V. because Ms. Vidrine frequently drove with the minor child in her vehicle after she had been drinking, had developed an alcohol and substance abuse addiction, had anger management issues rendering her unable to provide the child with safety and a stable and secure home environment, mismanaged the child's medical needs, and was unable to exercise her physical custodial rights because of her alcohol addiction. He further alleged that these acts also evidenced material changes of circumstances warranting a permanent change in legal and physical custody. The ex-parté relief was denied by Judge Ortego and the issues were initially fixed for contradictory hearing on November 23, 2015.[4]

---

[2] Although the consent judgment contained the parties' agreements on other child-rearing issues like child support, payment of medical expenses, and tax credit assignments, this appeal only concerns the judgment as it pertains to legal and physical custody of E.V.

[3] Louisiana Code of Civil Procedure Article 3945 (emphasis added) provides injunctive relief to "either party to an action for divorce or other proceeding which includes a provision for the temporary custody of a minor child" when "[i]t clearly appears from specific facts shown by a verified petition or by supporting affidavit that *immediate and irreparable injury* will result to the child before the adverse party or his attorney can be heard in opposition."

[4] The case was originally assigned to Division B. Chuck West, Mr. Vidrine's attorney when the judgment and JCIP were filed in 2013, ran for and was elected to the Division B bench. On November 9, 2015, Judge West recused himself from the matter based on his prior representation of Mr. Vidrine and had the case re-allotted to Division A, Judge Ortego presiding.

Because Ms. Vidrine was not properly served, the hearing was continued until January 25, 2016. On January 22, 2016, before the January 25 hearing, Ms. Vidrine hired counsel who filed a reconventional demand on her behalf for modification of legal and physical custody of E.V., including a request that Mr. Vidrine have supervised visitation with E.V., a protective order prohibiting Mr. Vidrine from mentally and physically harassing and abusing Ms. Vidrine, for interim spousal and child support, and for all costs and attorney fees. The January 25, 2016 hearing was continued and re-fixed by the court for March 7, 2016.

On February 17, 2016, Mr. Vidrine filed a motion to supplement and amend his November 6, 2015 rule to modify custody, adding allegations that Ms. Vidrine had physically abused E.V., and Ms. Vidrine's thirteen-year-old half-sister, E.S., had sexually abused E.V.[5, 6]

On March 7, 2016, Judge Ortego, who had not yet recused himself from the proceedings, signed Ms. Vidrine's opposed motion to continue and re-fixed the hearing for May 3, 2016.[7] Judge Ortego also signed an order appointing Dr. Kenneth

---

After a day and a half of trial, counsel for Mr. Vidrine orally moved to recuse Judge Ortego and shortly thereafter filed a written motion for same. All custody matters were effectively stayed until resolution of the recusal issue. Hearing on the recusal was fixed for September 30, 2016 before ad-hoc judge Harry Randow. On the day of the hearing, Judge Ortego recused himself from the Vidrine matter, and it was re-allotted back to Division B. Because Judge West had already recused himself, an ad hoc judge was requested of the supreme court. Trial on the parties' competing motions for custody that were originally filed in November 2015 and January 2016 were eventually heard by ad-hoc judge Ronald Cox on May 15 and 16, 2017.

[5] The pleading was fax-filed on February 17, 2016 and the original was filed on February 22, 2016.

[6] The sexual abuse was reported to the Department of Children and Family Services (DCFS). Ms. Vidrine was instructed by Ms. Jenkins, the DCFS worker assigned to the case, to keep E.V. away from E.S. The separation was also ordered by the trial court. We glean this from context clues in the record. Neither a minute entry nor an order reflecting the prohibition is in the record.

[7] There is no minute entry for a March 7, 2016 hearing in the record.

3

Bouillion to complete a 'family consultation' for purposes of the pending custody issues.[8]  Dr. Bouillion rendered his report on April 27, 2016.

After Dr. Bouillion submitted his report, Ms. Vidrine filed a motion for mental health evaluations pursuant to La.R.S. 9:331.[9]  Ms. Vidrine sought a child custody evaluation and/or psychological evaluations of the parties by an independent evaluator.  Her motion was fixed for hearing on May 20, 2016.

On May 3, 2016, Mr. Vidrine filed a second rule for emergency ex-parté custody based on the conclusions, recommendations, and confirmations of abuse in Dr. Bouillion's report.  Mr. Vidrine's request for ex-parté relief was denied and set for hearing on May 20, 2016.

On May 20, 2016, after hearing argument by counsel, the trial court denied Ms. Vidrine's motion for appointment of a mental health professional.  The court authorized each party to hire their own mental health expert for trial if they chose.  Also, on May 20, 2016, E.V. was privately interviewed by Judge Ortego in chambers.  Neither the parties nor the court reporter were present, and the attorneys, though

---

[8] Kenneth Bouillion, Ph.D. is a clinical psychologist licensed in Louisiana since 1977, who has extensive experience working with families and children.  He has been accepted as an expert witness in clinical and/or child psychology by Louisiana courts in Lafayette, Vermilion, Acadia, St. Landry, Iberia, St. Martin, St. Mary, Evangeline, Jefferson, Calcasieu, and Jeff-Davis Parishes. He is known to have extensive experience in evaluating children who allegedly have been sexually abused.

[9] Louisiana Revised Statutes 9:331, Custody or visitation proceeding, evaluation by mental health professional, provides:
> A. The court may order an evaluation of a party or the child in a custody or visitation proceeding for good cause shown. The evaluation shall be made by a mental health professional selected by the parties or by the court. The court may render judgment for costs of the evaluation, or any part thereof, against any party or parties, as it may consider equitable.
> B. The court may order a party or the child to submit to and cooperate in the evaluation, testing, or interview by the mental health professional. The mental health professional shall provide the court and the parties with a written report. The mental health professional shall serve as the witness of the court, subject to cross-examination by a party.

present, were prohibited from asking questions. The interview was audibly recorded, and the audio recording was eventually filed in evidence.

On May 20, 2016, the parties ultimately stipulated "on the record"[10] to unknown terms including, we deduce, an injunction prohibiting E.V. from attending therapy sessions with Ms. Lori Romero, a licensed professional counselor initially selected by Mr. Vidrine to assist E.V.'s transition between households, except in the case of an emergency.[11]

The parties' custody trial initially began on June 30, 2016, before Judge Ortego. Unable to complete the trial in a single day, a second day was fixed for August 18, 2016. During testimony on the second day of trial, counsel for Mr. Vidrine orally moved to recuse Judge Ortego. He was given ten days to file a written motion. In his written motion, Mr. Vidrine alleged that the trial judge failed to inform the parties and their counsel that "he had knowledge of the two (2) criminal investigations [of Ms. Vidrine and E.S.] conducted by the Evangeline Parish Sheriff's Office which contained the same facts and issues in this custody matter." The motion also alleged that after obtaining independent knowledge of the facts and issues relevant to the custody matters pending before it, Judge Ortego granted numerous opposed motions to continue filed by Ms. Vidrine, denied two emergency ex-parté custody requests filed by Mr. Vidrine, and refused to sign a warrant for Ms.

---

[10] The record contains a minute entry from May 20, 2016 indicating that counsel would prepare an order memorializing the parties' stipulations. Neither that order nor a transcript of the stipulations is in the record before us. Later pleadings and transcripts, however, reference the therapy and injunction.

[11] As per her C.V. filed in evidence, Lori Romero is a Licensed Professional Counselor in Lafayette, LA. She serves as the senior instructor of Psychology at the University of Louisiana at Lafayette and has a part-time private counseling practice, in which she often works with children of divorced, separated, or single-parent homes. She has been an LPC since 2006, has completed Louisiana's mandatory training for mediators, and is a certified parenting coordinator.

Vidrine's arrest properly requested by law enforcement officers. The recusal motion was fixed for hearing on September 30, 2016 before ad hoc Judge Harry Randow. On the day the recusal motion was fixed for hearing, but before it was heard, Judge Ortego recused himself. An ad hoc judge was requested, and the supreme court appointed Ronald Cox to preside ad hoc over the pending matters.[12]

On May 15 and 16, 2017, the competing custody modification motions were finally tried on the merits. The trial court took the matter under advisement and rendered written and oral reasons for ruling on May 19, 2017. The trial court found neither party met its burden of proving a material change in circumstances sufficient to warrant modification of custody and it maintained the parties' September 2013 consent judgment on custody with accompanying joint custody implementation plan. On June 16, 2017, a final judgment was signed. Mr. Vidrine filed a timely appeal.

### ASSIGNMENTS OF ERROR:

On appeal, Mr. Vidrine assigns eight errors:

1. The trial court committed legal error in failing to find a material change in circumstance sufficient to justify a modification of custody.

2. The trial court committed legal error in denying Appellant's rule to modify custody.

3. The trial court committed legal error in valuing the "cooperative parent factor" above all else as a matter of law.

4. The trial court committed legal error in maintaining co-domiciliary parent[] status.

5. The trial court committed manifest error in finding that Appellant has been "uncooperative for years."

---

[12] The record suggests the hearing did not go forward, as the corresponding minute entry indicates that Judge Ortego (the subject of the recusal hearing) was presiding and granted the motion to recuse.

6. The trial court committed legal error in disregarding expert testimony.

7. The trial court abused its discretion in failing to give any weight to expert testimony.

We will discuss all seven assignments together.

## **DISCUSSION:**

Standard of Review:

In an action to modify a custody decree, the trial court must first determine whether the decree is a considered decree or a consent decree. *See Moss v. Goodger*, 12-783 (La.App. 3 Cir. 12/12/12), 104 So.3d 807. When the underlying decree is a stipulated judgment (i.e. no evidence of parental fitness was taken by the court), the moving party has the burden of proving that a material change in circumstances has occurred since rendition of the underlying decree, and that the modification will be in the child's best interest. *See Evans v. Lungrin*, 97-541 (La. 2/6/98), 708 So.2d 731.

A material change in circumstance is a change that "negatively impacts the welfare of the child." *LeBlanc v. LeBlanc*, 06-1052, p. 9 (La.App. 3 Cir. 2/14/07), 951 So.2d 500, 507. A trial court's determination of whether a material change in circumstances has occurred is a factual finding. *See Kyle v. Kier*, 17-134 (La.App. 3 Cir. 11/15/17), 233 So.3d 708; *See also Bonnecarrere v. Bonnecarrere*, 09-1647 (La.App. 1 Cir. 4/14/10), 37 So.3d 1038, *writ denied*, 10-1639 (La. 8/11/10), 42 So.3d 381. The trial court's factual conclusions are given substantial deference by appellate courts in child custody matters. *Steinebach v. Steinebach*, 07–38 (La.App. 3 Cir. 5/2/07), 957 So.2d 291. Unless there is a legal error, "[t]he determinations made by the trial judge as to custody [] will not be set aside unless it clearly appears [from the record] that there has been an abuse of discretion." *Nugent v. Nugent*, 232

7

So.2d 521, 523 (La.App. 3 Cir. 1970); *See also Mulkey v. Mulkey*, 12-2709 (La. 5/7/13), 118 So.3d 357. "The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts." *McCorvey v. McCorvey,* 05–174, p. 4 (La.App. 3 Cir. 11/2/05), 916 So.2d 357, 362, *writ denied*, 05–2577 (La. 5/5/06), 927 So.2d 300.

Absent legal error, appellate courts must "review the record in its entirety and (1) find that a reasonable basis does not exist for the finding, and (2) further determine that the record clearly establishes that the fact finder is clearly wrong or manifestly erroneous" before a court's factual findings and conclusions can be reversed. *Moss*, 104 So.3d at 810. If the trial court's findings of fact are reasonable, appellate courts should not reverse them. *See Moss*, 104 So.3d 807. However, appellate courts are also prohibited from simply rubberstamping a trial court's findings of fact. *Id.* Instead, we are constitutionally mandated to review all the facts contained in the record and determine whether the trial court's findings are reasonable considering the entire record. *Id.*

"Because the court of appeal has a constitutional function to perform, it has every right to determine whether the trial court [judgment] was clearly wrong based on the evidence, or clearly without evidentiary support. When a fact finder abuses its discretion, de novo review by appellate courts is warranted. *See Green v. K-Mart Corporation*, 03-2495 (La. 5/25/04), 874 So.2d 838.

Additionally, when a trial court applies incorrect legal principles and these errors materially affect the outcome of a case and deprive a party of substantial rights, legal error occurs. *Evans v. Lungrin*, 97-541, p. 7 (La. 2/6/98), 708 So.2d 731, 735. "[W]here one or more trial court legal errors interdict the fact-finding process, the

manifest error [(or abuse of discretion)] standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence." *Id.*

<u>Legal Error</u>

In this case, we find two legal errors that interdicted the trial court's fact-finding process and further find abuse of the trial court's discretion in its overall decision. First, the parties specifically stipulated in their JCIP that remarriage of either party provided an avenue for either party to seek modification of the custodial agreement. We find that in this instance, de novo review was intended by both parties. Mr. Vidrine married Taylor Vidrine after he and Ms. Vidrine's 2013 stipulation. At the time of trial, Phillip and Taylor Vidrine had two children together who are E.V.'s only siblings. Therefore, Mr. Vidrine was entitled to a de novo custody trial without having to prove a material change in circumstances. Especially in light of the original stipulated judgment so providing, Mr. Vidrine's re-marriage, change of address and work schedule, and the birth of two additional children certainly constituted a "material" change of circumstances that the evidence showed positively impacted E.V.

Second, the parties had agreed to shared physical custody on a fourteen-day rotation because at that time Mr. Vidrine was working offshore in fourteen-day shifts. Uncontroverted trial testimony was that Mr. Vidrine no longer does shift or offshore work. When asked if he thought the 2013 consent judgment was in E.V.'s best interest at the time it was confected, Mr. Vidrine testified that he "had nowhere else for [E.V.] to go when [he] was gone for fourteen days." Mr. Vidrine's substantial change in his fourteen (14) on and fourteen (14) off schedule and work location, and feasibility of Mr. Vidrine having physical custody of E.V. more frequently than

every fourteen days, is likewise a material change in circumstances that positively impacted E.V.

Third, the trial court failed to designate a domiciliary parent. The trial court's failure to designate a domiciliary parent pursuant to La.R.S. 9:335.1 and the supreme court's holding in *Hodges v. Hodges*, 15-585 (La. 11/23/15), 181 So.3d 700 constituted legal error. "Appellate review of questions of law is simply to determine whether the trial court was legally correct or legally incorrect. If the trial court's decision was based on its erroneous interpretation or application of the law, rather than a valid exercise of discretion, such incorrect decision is not entitled to deference by the reviewing court." *Citgo Petroleum Corp. v. Frantz*, 03–88, p. 3–4 (La.App. 3 Cir. 6/4/03), 847 So.2d 734, 736, *writ denied*, 03–1911 (La.10/31/03), 857 So.2d 484 (citations omitted).

As we will discuss below, all three of these legal errors warrant a de novo review of the record by this court without deference to the trial court's factual findings. Accordingly, we have reviewed this case *de novo*, giving no weight to the trial court's judgment or underlying findings of fact. *See Domingue v. Boden*, 08-62 (La.App. 3 Cir. 11/4/08), 996 So.2d 654 ("under the de novo standard of review, the appellate court assigns no special weight to the trial court and, instead, conducts a de novo review of questions of law and renders judgment on the record.") In our de novo review, we review the entire record and make independent findings of fact and legal conclusions. *See Ferrell v. Fremen's Fund Ins. Co.*, 94-1252 (La. 2/20/95), 650 So.2d 142; *See also Clement v. Citron*, 13-63 (La.App. 3 Cir. 6/19/13), 115 So.3d 1260 (when the court of appeal finds that a . . . manifest error of material fact was made in the trial court, it is required, whenever possible, to redetermine the facts de novo from the entire record and render a judgment on the merits; and *Lasha*

*v. Olin Corp.*, 625 So.2d 1002 (La. 1993). Nevertheless, based on the record before us, we further find that Mr. Vidrine did prove a material change in circumstances had occurred and that it is in E.V.'s best interest that he be named E.V.'s domiciliary parent.

<u>Material Change in Circumstances</u>

Our review of the entire record convinces us that Ms. Vidrine is now incapable of ensuring E.V.'s safety and acting in his best interest. Ms. Vidrine has behaved in ways that have physically and emotionally harmed E.V. The record is rife with consistent statements made by E.V. to multiple individuals, including physicians, mental health professionals, child advocates, law enforcement, and his father and step-mother over the course of several months, that his mother was physically abusive toward him, had thrown a remote control device at him after he accidentally dropped a kindle in the bathtub, that she called him the 'f' word and the 'a' word, and that the remote left a bruise on his back; that his mother whipped him all the way down the hall to her room for accidentally spilling milk one evening, then locked him in her room, telling him he would stay in there for the rest of the year. E.V. testified that he heard her hollering and throwing chairs or other objects in other parts of the house.

E.V. consistently stated that his mother has punched holes in the walls when angry with him, threatened to take him away from his father, directed E.V. to lie to the DCFS investigator, his therapist, and his father about various events that had occurred during her custodial periods, and had also instructed E.V. not to tell anyone about what happens when he is at her home.

The record supports the fact that Ms. Vidrine habitually visited bars on her way home from work. According to E.V., "mom goes to the bar a lot[,]" "she usually

11

goes to the bar." E.V. claimed that he frequently went to his maternal grandparents' home after school during his mom's physical custodial time, and was often picked up late at night, around ten p.m. He was tired at school the next day. E.V. made consistent claims that his mother drinks significantly in his presence, which intensified her anger. There have been several instances in which the mother consumed alcohol before driving, and more than once she drove while believed to be intoxicated with E.V. in the vehicle.

The record indicates that, especially when drinking, Ms. Vidrine makes poor and selfish judgment calls, disregarding the best interest of E.V. For example, while drinking at a softball game, Ms. Vidrine left E.V. in a dug out babysitting a three-year-old; Ms. Vidrine forced E.V. to go to a cook off even though he was sick and running a fever and she refused to take him home; and Ms. Vidrine tried to leave E.V. at a Halloween party so that she could go to an adults-only party. Once, Ms. Vidrine left E.V. in the car in the parking lot of Piggly Wiggly while she went inside to buy beer and an unknown individual got in the car. E.V. was scared.

In its reasons for ruling, the trial court stated: Mr. Vidrine "has pictures of bruises on [E.V.] from 2012 and there has been no testimony of [Ms. Vidrine] beginning to drink after that [(the September 9, 2013 stipulated)] Judgment. The trial court found "the circumstances existed prior to the date of the Judgment." The trial court further explained: "I don't think she's [(Ms. Vidrine)] changed her discipline. I don't think she's changed whether or not she drinks or likes to go out. I don't think she's changed any of that since September the 9th, 2013. I think the situation is not -- there is not a material change; they're the same."

We do not agree with the trial court that escalation of Ms. Vidrine's anger and alcohol problems precludes finding a material change in circumstances because

some problems may have existed in and before 2013. There is no evidence in the record to support a finding that Ms. Vidrine drove E.V. while intoxicated, left him alone in parking lots, or left him with caretakers until late at night while she was at bars before 2013.

The record also lacks any substantial evidence that Ms. Vidrine physically and emotionally abused E.V. on a regular basis in and prior to 2013. Although Mr. Vidrine testified that during their marriage, Ms. Vidrine punched a hole in a wall once and hit E.V. across the face after he threw up once when he was two, the record is otherwise void of any evidence to support a finding that Ms. Vidrine's behavior has not changed and her actions have not escalated since 2013. To suggest that because Mr. Vidrine believed Ms. Vidrine had anger issues before 2013, he is precluded from using Ms. Vidrine's present and increasingly harmful and violent behavior as a basis for showing a material change in circumstance is unreasonable and certainly not in E.V.'s best interest. The evidence clearly shows that Ms. Vidrine's anger and alcohol problems are manifesting themselves in increasingly more abusive behaviors and their escalation is negatively impacting E.V. physically and emotionally.

More importantly to this court, prior to the parties' 2013 consent judgment, there was no evidence of sexual abuse of E.V., whose complaints of repeated sexual abuse by his mother's half-sister, E.S., have been consistent and found to be credible by both Dr. Bouillion and Lori Romero. The record also indicates that Ms. Vidrine refused to keep her son away from her half-sister, E.S., who, according to E.V., has sexually abused him on many occasions. In fact, after being told by the DCFS worker to keep E.S. away from E.V., Ms. Vidrine ignored those orders and the sexual abuse continued, according to E.V. After being ordered by the trial court not to

13

allow E.S. and E.V. to be alone together, the mother admittedly allowed E.S. to babysit E.V. while she went to a parent teacher conference. E.V. claimed that he was often left alone in E.S.'s presence and the abuse continued.

In her trial testimony, Ms. Vidrine wholly denied that any abuse, physical or sexual, occurred during her physical custodial periods, despite the overwhelming evidence to the contrary. Dr. Bouillion, the court appointed expert, and Lori Romero, the child's therapist, both testified that E.V.'s disclosures of abuse were consistent and credible, and further testified that Ms. Vidrine's failure to believe and protect E.V. was detrimental to his development.

For these reasons, we find that the trial court abused its discretion when it found there was not a material change in circumstances sufficient to warrant modification of custody. The evidence, when considered as a whole, clearly supports a finding that a material change in circumstances has occurred since 2013.

Having already found the record supports a finding of material changes in circumstances as well as legal error, we now turn to the second prong of modification of custody, whether the modification is in the best interest of the child. In our de novo review, we review the entire record and will make independent findings of fact and legal conclusions. *See Domingue v. Boden*, 08-62 (La.App. 3 Cir. 11/4/08), 996 So.2d 654 ("under the de novo standard of review, the appellate court assigns no special weight to the trial court and, instead, conducts a de novo review of questions of law and renders judgment on the record").

<u>Best Interest of the Child</u>

In any child custody case, the paramount and overriding goal is to determine what is in the best interest of the child, and the court must "award custody of a child in accordance with the best interest of the child." La.Civ. Code art. 131. This applies

not only in actions setting custody initially, but also in actions to change custody." *Tracie F. v. Francisco D.*, 15-1812, p. 9 (La. 3/15/16), 188 So.3d 231, 239. In determining the best interest of a child, courts must consider the twelve factors set forth in La.Civ. Code art. 134. However, these factors are illustrative, not exclusive. *Arrington v. Campbell*, 04-1649 (La.App. 3 Cir. 3/9/05), 898 So.2d 611. The court need not specifically address each factor. Additionally, the court is free to consider additional factors not included in the Article 134 list. "Every child custody case must be viewed based on its own particular facts and relationships involved, with the goal of determining what is in the best interest of the child." *Mulkey v. Mulkey*, 12-2709 (La. 5/7/13), 118 So.3d 357.

"The best interest of the child is the sole criterion to be met in making a custody award, as the trial court sits as a sort of fiduciary on behalf of the child and must pursue actively that course of conduct which will be of the greatest benefit to the child." *Hodges v. Hodges*, 15-585, p. 3 (La. 11/23/15), 181 So.3d 700, 702. The Louisiana Supreme Court and the Louisiana Legislature have noted "that the primary consideration and prevailing inquiry [of the court] is whether the custody arrangement is in the best interest of the child." *Steinebach*, 957 So.2d at 294.

In determining custody, the court is mandated to "award [legal] custody to the parents jointly" unless clear and convincing evidence indicates the child's best interest can only be served by an award of sole legal custody. La.Civ. Code art. 132. Joint legal custody is presumed to be in the child's best interest. *Hodges*, 181 So.3d 700. When joint legal custody is awarded, the court shall also render a joint custody implementation order that allocates the time periods each parent will have physical custody of the child and allocates the legal authority and responsibility of the parents. La.R.S. 9:335(A)(1), (2)(a), and (3).

When allocating periods of physical custody, the court should award time to the parents equally if feasible and in the child's best interest. La.R.S. 9:335(A)(2)(b). If shared physical custody is not awarded, the physical custodial periods should assure the child "of frequent and continuing contact with both parents." La.R.S. 9:335(A)(2)(a).

When allocating legal authority and responsibility of the parents, "the court shall designate a domiciliary parent except where there is an implementation order to the contrary or for other good cause shown." La.R.S. 9:335(B)(1). The domiciliary parent is the "parent with whom the child shall primarily reside" and the domiciliary parent has "authority to make all decisions affecting the child unless an implementation order provides otherwise." La.R.S. 9:335(B)(2) and (3). "All major decisions made by the domiciliary parent . . . shall be subject to review by the court upon motion of the other parent. It shall be presumed that all major decisions made by the domiciliary parent are in the best interest of the child." La.R.S. 9:335(B)(3).

We now review all the evidence de novo to determine what is in the best interest of E.V.[13]

When considering the evidence, several themes emerged that consistently demonstrated that E.V.'s best interest would be served by naming his father, Phillip Vidrine, as domiciliary parent and by modifying the parties' physical custodial schedule. The physical abuse suffered by E.V. on multiple occasions at the hands of his mother was consistent throughout the evidence. Second, the record exhibited credible reports of sexual abuse of E.V. perpetrated by his then-thirteen-year-old

---

[13] We note that even if our review was under the manifest error standard, our result in this case would be the same.

maternal half-aunt, E.S., during Ms. Vidrine's physical custodial periods.[14] The emotional abuse inflicted on E.V. by Ms. Vidrine, Ms. Vidrine's substance abuse problems, and Ms. Vidrine's consistently poor decisions and their negative effects on E.V. were the remaining themes that emerged in the evidence and heavily influenced our decree. The record also contained consistent evidence of Mr. Vidrine's better ability to parent E.V. Finally, E.V. expressed consistently and reasonably his overwhelming desire to live with his father.

*Physical Abuse:*

We find that Ms. Vidrine has physically abused E.V. on several occasions since the 2013 stipulated custody judgment. The first incident to make this an issue before the court occurred in December 2015. Shortly after E.V. returned home from his mom's house, Mr. Vidrine noticed a bruise on his back. When he asked E.V. what happened, E.V. said he was watching a show on the kindle while taking a bath. The kindle accidentally fell into the bathtub. His mom was angry and got him out of the tub. She hit him with a remote control and called him the 'a' word and the 'f' word. Mr. Vidrine called the child's counsellor, Ms. Romero, who advised him to take E.V. to the hospital and to contact law enforcement. Mr. Vidrine followed both of those recommendations.

Medical records from Women's and Children's hospital reflect that E.V. told the E.R. physician his mother had hit him with a remote, that E.V. had a contusion "consistent with being hit by a remote", that physical abuse was suspected, and that hospital personnel reported the suspected abuse. Law enforcement officers asked

---

[14] Danielle Vidrine's father, Brian Soileau, had re-married and he and his wife had a daughter, E.S., who was Danielle's half-sister. Brian Soileau's wife is Nicole Soileau, called "Nana" by E.V. Brian and "Nana" live about a half mile away from Danielle and would care for E.V. after school and frequently over weekends when Danielle had custody.

Mr. Vidrine to bring E.V. to the Rapides Parish Child Advocacy Center, which he did on December 30, 2015. E.V.'s interview was recorded. Our review of the video shows that E.V. appears as a well-cared for, articulate, well-behaved young boy. He answers questions directly. He tells his story simply, without any sign of exaggeration or hyperbole. When asked by the child advocate to tell her what happened, E.V. said "she (his mother) put the kindle fire on the bathtub and it fell and she got me out and she threw the remote at me." He further explained that the kindle fire slipped into the bathtub and his mother then hit him with the remote; she "got [him] out and she hit [him] with the remote."

E.V. stated that only he and his mom were in the bathroom when the incident occurred. He further stated that his mom hit him with the remote on his back and then clearly identified his back for the advocate. When asked what it felt like when she hit him with the remote, E.V. said "it hurt." He said the remote left a bruise that was "little and it hurts." He told the advocate his mom was saying the 'a' word and the 'f' word when she hit him with the remote. When asked if he made any noises or sounds when his mom hit him with the remote, E.V. said that he cried and when he cried, "she fussed me even more." He said his mom hollered at him. E.V. was unable to remember exactly when his mom had hit him, but indicated he still had the bruise. He confirmed that no one told him what to say in the interview. When asked, he said nothing bad ever happened at his dad's home.

E.V. discussed the kindle incident with Ms. Romero shortly after it happened. Her notes indicate that he reported the event consistently, had physical evidence of injury, and did not appear to be coached or rehearsed. In his deposition, Dr. Bouillion testified that E.V. also reported the kindle fire incident to him. Dr. Bouillion's description of the event matches the accounts of other individuals in the

18

record, including E.V. himself. Dr. Bouillion testified that E.V.'s reports were credible.

Detective Stelly, the investigating officer, testified at trial that he concluded that "[Ms. Vidrine] made physical contact with [E.V.]" and he saw bruises on E.V.'s back. He testified that his investigation exposed enough evidence to support charging Ms. Vidrine with cruelty to a juvenile. He testified that he, with approval of his captain, requested a warrant for Ms. Vidrine's arrest. He further testified that Judge Ortego denied the warrant request without reasons, which was unusual because often when a warrant request was denied, the judge would explain why so the officer could correct any deficiencies and re-submit the warrant.

During the course of this litigation, E.V. described the remote-control incident at least five different times to at least five different people and every account of the incident in the record is consistent, which lends additional support to the conclusion that E.V.'s statements were credible.

The remote-control incident is not the only physical abuse of E.V. by his mother evidenced in the record. In April 2016, E.V. told Ms. Romero that his mother had slapped him in the face for screaming when E.S. chased him.[15] A month later, in May 2016, E.V. told Ms. Romero that when he accidentally spilled milk at the table, his mom whipped him all the way down the hall to her room. She then told him he was punished for the rest of the year before locking him into the bedroom by himself. E.V. stated that he could hear his mom hollering and throwing furniture in other parts of the house through the walls.

---

[15] E.V. also claimed that E.S. and her sister, L.S., often teased and bullied him.

E.V. disclosed that his mom physically punished him for talking to Ms. Jenkins, the DCFS worker investigating the abuse allegations. E.V. also reported to Lori Romero on more than one occasion that his mom had become angry and spanked him for talking to her during their sessions. He also said that he was physically punished by his mom for asking if his dad knew Ms. Jenkins on the phone one night. According to Ms. Romero, fear of his mom's retributions made E.V. increasingly reluctant to open-up to Ms. Romero as freely as he had when he first began counseling in August 2015.

Ms. Vidrine's trouble appropriately channeling and controlling her anger does not seem to be a novel occurrence. Mr. Vidrine testified that when E.V. was two, before the parties had separated, Ms. Vidrine had slapped E.V. across the face for throwing up on the floor. Pictures of the multiple bruises on E.V.'s face taken in 2012 were discussed at trial. However, the record shows that Ms. Vidrine's anger and subsequent physically and emotionally inappropriate behavior has increased and intensified over the years.

E.V. reported to Ms. Romero that his mother whips him and punches holes in the wall when she is angry, and she gets angry often, especially when she has been drinking. E.V. described to Ms. Romero and Judge Ortego how he was generally punished by his mom, indicating that his mom spanks him frequently and "leave[s] red marks[,]" which he does not like. He described a specific incident that occurred before this litigation began in which E.V. angered his mother by accidentally spilling water in the bed and was physically punished by her.

In her interviews with Dr. Bouillion, Ms. Vidrine justified her abusive behavior by explaining that she and Mr. Vidrine had "different discipline styles". She denied causing or seeing bruises on E.V. and even denied seeing pictures of

bruising on E.V. She denied throwing a remote control at E.V. but did admit to spanking him for jumping on furniture in December 2015.

At trial, Ms. Vidrine likewise denied abusing E.V., throwing a remote control at him, hitting him, and punishing and spanking him "all the time." Although she denied ever physically abusing E.V., she admittedly threatened to "spank his ass."

Ms. Vidrine's father, Brian Soileau, also testified at trial. Mr. Soileau indicated that he sees Ms. Vidrine and E.V. often because he lives a half-mile from Ms. Vidrine and he and his wife keep E.V. frequently. Mr. Soileau testified that he had **never** seen Ms. Vidrine's temper flare, had never seen bruises on E.V., and had never heard E.V. complain of any abuse by his mother or E.S.

*Sexual Abuse:*

The record supports the conclusion that E.V. was sexually abused by his then thirteen-year-old maternal half-aunt, E.S. The record also shows that Ms. Vidrine absolutely refused to give credence to any of E.V.'s disclosures of abuse and, more importantly, refused to protect E.V. from additional sexual abuse by E.S. In fact, we conclude from the record that Ms. Vidrine's flagrant disregard for instructions by DCFS and the trial court to keep E.S. away from E.V. directly resulted in at least two more instances during which E.V. was sexually abused by E.S.

The first report by E.V. of sexual abuse by E.S. came in early January 2016, when one of Taylor Vidrine's friends was at the Vidrine's house with her two young daughters. One of the girls ran up to the parents complaining that E.V. had tried to pull down her pants and tried to look at her privates. Mr. Vidrine immediately questioned E.V., who told him that was what E.S. did to him at his Papa Brian and "Nana"'s house. Taylor Vidrine immediately called Ms. Romero, who advised they contact law enforcement. Mr. Vidrine did so, and law enforcement began an

investigation, which, according to Detective Stelly, was inexplicably taken over by the District Attorney (DA). The DA ultimately declined to charge E.S.

Additionally, DCFS was called and the case was investigated by Ms. Jenkins, who indicated that DCFS could not "validate" this "child on child" complaint. Dr. Bouillion, whom we note is a well-recognized and credentialed expert in child sexual abuse cases, later described the DCFS investigation as "inadequate."

In his subsequent sessions with Ms. Romero, E.V. disclosed that E.S. had pulled his pants down more than once, looked at his privates, and touched his privates. This was consistent with E.V.'s January 4, 2016 recorded statements to the Rapides Parish Child Advocacy Center, in which he stated E.S. "touches my privates . . . she pulls my pants down and then she pulls them back up. . . . she pulls my pants down and my underwear and she- and she touches it." He explained that E.S. touched his penis with her finger and that it felt "not good." E.V. was unable to say how often it happened, but he knew it happened more than one time. He said he was in the sunroom watching cartoons when E.S. "made me turn around and then she touched my privates." He stated she touched him under his clothes on his skin. Although he was unable to give a date of the abuse, he did state that he was six every time E.S. touched him, meaning the sexual abuse began no earlier than October 30, 2015.

In February 2016, E.V. seemed reluctant to talk to Ms. Romero, according to her testimony. She indicated that E.V. seemed "obviously burdened." E.V. later disclosed that even though his mom promised Ms. Jenkins, the DCFS worker, to keep E.V. away from E.S., she didn't. She brought him directly to where E.S. was as soon as Ms. Jenkins left. He also disclosed that his mother continued to leave him alone with E.S.

In March 2016, E.V. told Ms. Romero that E.S. continued to sexually abuse him. He explained that E.S. continued to touch his "bad parts, [his] cherry bird, [his] private parts, referring to his penis" and said his mom left him alone with E.S. "every time" she had custody of him even though it had been prohibited by DCFS. E.V. further reported to Ms. Romero that in addition to being touched by E.S., she was now making him touch her genitalia and breasts.

In May 2016, E.V. told Ms. Romero that Ms. Vidrine had left him alone with E.S. on at least two recent occasions. He described two more sexual abuse occurrences. Both times, E.V. claims he cried as he was telling his mother. He said his mom promised they wouldn't go back over there, but they did and "she [(E.S.)] did it again."

E.V. also disclosed the sexual abuse by E.S. to Dr. Bouillion, claiming E.S. touched E.V.'s penis when no one else was around at "Nana's house". E.V. disclosed that E.S. had inappropriately touched him several times, "more than one" but the exact number was unknown. Dr. Bouillion conclusively stated that as of April 21, 2016, E.V. was reporting that E.S. was "continuing to baby-sit him at times." Dr. Bouillion testified that E.V. was extremely credible and Ms. Vidrine's unwillingness to work with what her child was saying was evidence of poor moral fitness, especially since "most moms would be breaking down doors to get at what is happening, if they are making allegations such as this. That has been my experience, that they want to get to the bottom of it. They want to stop whatever happened to harm their child. They want to find out."

Ms. Vidrine acknowledged to Dr. Bouillion in her interviews with him that E.V. told her about the sexual abuse by E.S. Ms. Vidrine stated that she had not confronted E.S. or discussed the sexual abuse allegations with E.S. because they

were "ridiculous lies." Even though E.V. was crying and hugging her when describing the sexual abuse, and despite his disclosing multiple incidents over an extended period, Ms. Vidrine did not believe it was true. Contrary to E.V.'s disclosures to Lori Romero and Dr. Bouillion, Ms. Vidrine told Dr. Bouillion she had not left E.V. and E.S. alone together since DCFS told her to keep E.S. away.

At trial, Ms. Vidrine admitted that she did not believe E.V. had been sexually abused and that E.S. continued to babysit E.V. Brian Soileau testified that he too did not believe E.V.'s claims of sexual abuse by E.S. Contrary to Ms. Vidrine's testimony and other evidence in the record, Mr. Soileau testified that E.S. had never babysat E.V. He testified that he didn't believe the allegations against E.S. because he was at home and would have known if the abuse had occurred. He claimed that E.S. and E.V. had not been alone together since January 2016. He supported this conclusion by explaining that he works from home and would have known if they had spent any time together alone. However, when pressed, he admitted he does not maintain one-hundred-percent constant supervision of the children.

Detective Stelly testified that although an investigation into the sexual abuse allegations began at the sheriff's office, the District Attorney inexplicably took over the file and he did not know whether an investigation was completed or its outcome. He stated that was a very unusual occurrence.

Dr. Bouillion testified that if Ms. Vidrine had allowed E.S. to be around E.V. unsupervised after E.V. had accused E.S. of sexually abusing him or after the DCFS and court's prohibitions against contact between the two, it would not be "good judgment." Dr. Bouillion described the effect of Ms. Vidrine not believing E.S. about the abuse as "upsetting [to E.V.] that she doesn't believe him and doesn't protect him[,] which makes [E.V.] insecure with increased anxiety and a desire to

spend more time with his father and less with his mother." He recommended that E.V.'s contact with E.S. be restricted.

The record suggests that Ms. Vidrine was instructed by DCFS and the court to keep E.V. away from E.S. There is credible evidence that she disregarded those instructions, which facilitated a ripe environment for additional sexual abuse to occur. The record indicates that the sexual abuse of E.V. by E.S. continued throughout and escalated during the spring of 2016. When asked in May 2016 about seeing E.S. again, E.V. said, "I don't want to see [E.S.] again."

The record evidence clearly supports the conclusion that E.V. was sexually abused by E.S. E.V.'s disclosures of the abuse, where it occurred, how many times it occurred, and how it occurred are consistent throughout the record. Additionally, both mental health providers found E.V. to be consistently credible in his reports of abuse. However, despite the consistent, credible evidence of the sexual abuse, including disclosures by E.V., the recommendations and findings of Lori Romero, Dr. Bouillion's recommendations and conclusions in his deposition and report, and the testimony of Mr. Vidrine, Ms. Vidrine continues to describe E.V.'s disclosures as ridiculous and insists they did not happen. She testified that she believed E.V. was "maybe being coached a little bit[, o]r manipulated" to make false allegations of physical and sexual abuse.

*Emotional Abuse:*

The record supports that Ms. Vidrine engages in harmful behaviors even when she is not physically abusing E.V. or exposing him to potential sexual abuse. E.V. reported that his mom punched holes in the walls in his presence when angry, and according to Dr. Bouillion "for a five or six-year-old to see a parent punch a hole in a wall is scary." The record also suggests the conclusion that after Ms. Vidrine

25

engages in inappropriate fits, she cries in front of E.V. or otherwise tries to manipulate him with guilt to keep him from disclosing the events to his father or Ms. Romero.

E.V. also disclosed that his mother "threatened to throw [E.V.] into the pool so he can't breathe" if he told anyone that he was still being left with E.S. unsupervised, according to Ms. Romero's notes. Ms. Vidrine admittedly cursed at E.V., using the f-word

The record supports our finding that Ms. Vidrine consistently engaged in actions constituting emotional abuse of E.V. Throughout his sessions with Ms. Romero and with Dr. Bouillion, E.V. consistently stated and complained that his mother did not let him talk to his father often when he was at her house, and when communication was allowed, it was over speaker phone.

E.V. also consistently reported in his disclosures that his mom instructs him not to tell anyone else what happens during her physical custodial periods and consistently threatened to take E.V. away from his father such that he would never see him again. Ms. Romero's reports indicate that E.V. has a genuine fear that his mother will take him away from his father and E.V. gets extremely nervous if he sees, or even thinks he sees, his mother during his father's custodial periods. E.V. was consistently afraid his mom would follow through on her threats and come and get him from his father's house. This fear of his mother taking him away from his father is evidenced throughout the record and throughout E.V.'s therapy sessions with Ms. Romero.

Dr. Bouillion recommended that E.V.'s access to his parents not be restricted or supervised by either parent and suggested E.V. needed fairly regular contact with his dad, at least 3-4 times a week unsupervised. He described the present supervised

conversations between E.V. and Mr. Vidrine when E.V. was at Ms. Vidrine's house as "awkward and strained." He recommended that E.V.'s contact with E.S. be restricted.

The record supports a finding that Ms. Vidrine instructed E.V. to lie to his father and step-mother, and to lie to Ms. Jenkins, the DCFS worker. The lies included: telling his dad, step-mother, and Ms. Jenkins that the sexual abuse by E.S. did not occur, telling Ms. Jenkins that his father and step-mother caused the bruises, and telling Ms. Romero that his father sexually abused him. Dr. Bouillion testified that if Ms. Vidrine asked E.V. to lie or to blame his father for any of the abuse he'd suffered, that would be "hurtful that she would even propose he blame his dad[,]" an action that "stands reality on its head[,]" and is a "serious breach of parental etiquette." He stated that if Ms. Vidrine was coaching E.V. to say his father sexually abused him, that would be a "serious failure of judgment" and he would be "seriously concerned." He further stated that if the alienating attempts by Ms. Vidrine continued, her contact with E.V. should be restricted.

Ms. Vidrine consistently refused to believe E.V. Ms. Vidrine told Dr. Bouillion that Mr. Vidrine spoils E.V. and was brainwashing and manipulating him. Dr. Bouillion recommended that E.V. continue seeing Ms. Romero. Dr. Bouillion suggested it would be helpful for Ms. Vidrine to meet and work with Ms. Romero on improving her relationship with E.V.

In late May 2016, before Judge Ortego recused himself, Mr. Vidrine understood that Judge Ortego had prohibited any more sessions between Ms. Romero and E.V. prior to trial (then fixed for June 30, 2016) unless an emergency

occurred.[16] On June 9, 2016, Mr. Vidrine contacted Ms. Romero claiming E.V. was "basically non-responsive" when Taylor picked him up from his mom's. At a session shortly thereafter, E.V. avoided eye contact with Ms. Romero and had decreased verbalizations compared to prior sessions. E.V. admitted to being nervous, said his head was hot and made him sleepy. He reiterated that he wanted to talk to his dad when he is at his mom's but when he asks for permission, his mom says no.

Ms. Romero saw E.V. one final time on June 15, 2016. She noted that E.V.'s anxiety was manifesting into anger. E.V. claimed his mom told him to be mean to his younger half-sister, D.V., with whom he had always had a loving relationship. He reported having difficulty playing with his cousins and cried. He admitted he "need[ed] to tell" Ms. Romero something and, according to Ms. Romero, E.V. went on to say that his mom told him to tell her (Ms. Romero) that his dad had been touching his private parts. While making that disclosure to Ms. Romero, E.V. was crying so hard "he could barely speak." When she questioned him directly, E.V. told Ms. Romero that his father had never touched his private parts. Ms. Romero concluded that the pressure placed on E.V. by his mother to lie about his father touching him gave him much anxiety.

During his recorded interview with Judge Ortego on May 20, 2016, when Judge Ortego asked him if he still wanted to see his mom and go to her house, E.V. replied with a negative "uh-uh." E.V. expressly stated: "I don't want to go to my mom's." Judge Ortego probed further, asking in disbelief "you're telling this judge you don't want to go to your mom's house?" E.V. replied, "yes."

---

[16] Again, there is no transcript, written court order, or minute entry to reflect this injunction; we learned of its existence after reviewing the record in its entirety, particularly the transcript of Ms. Romero's June 30, 2016 testimony.

At trial, E.V.'s baseball coach described noticing changes in E.V.'s behavior depending on which parent he was with. During his mother's custodial periods, E.V. was "closed, shut down, and nervous." E.V. also reportedly told the coach that he "want[ed] to stay at [his] daddy's."

The record supports our finding that Ms. Vidrine has physically abused E.V., has threatened E.V. with bodily harm, and has consistently threatened to take E.V. away from his father and blocked conversation between E.V. and Mr. Vidrine during her physical custodial periods. She has asked her six-year-old son to lie to authorities and his therapist about physical and emotional abuse she perpetrated on him as well as sexual abuse perpetrated by E.S. This would be inappropriate to ask of any minor child, but especially one so young who loves and wants to please both of his parents.

*Alcohol abuse*:

The record also supports a finding that Ms. Vidrine has alcohol abuse issues that negatively affect E.V. Ms. Vidrine admittedly drove with the minor child in her vehicle after consuming alcohol. The record shows that she often leaves E.V. at her father's home or with a caretaker until late at night so that she could frequent bars. She has left E.V. alone in the parking lot of a grocery store while she went inside to buy beer. The record supports a finding that when Ms. Vidrine drinks, her angry and volatile reactions increase. E.V. told Ms. Romero he was afraid of his mother, especially when she had been drinking. He relayed that his mom drinks and gets angry. E.V. reported to Ms. Romero that his mom regularly drinks beer and wine and engages in angry outbursts when she is intoxicated. E.V. also described instances as early as October 2015 and continuing through at least March 2016 in

which Ms. Vidrine was driving him in a vehicle after she had been drinking, which he found scary.

E.V. told Dr. Bouillion that sometimes his mom has beer in the car. He described to Dr. Bouillion an incident in which his mom left him in the car while she went into Piggly Wiggly and a stranger got inside the car. He was scared.

Ms. Vidrine admitted at trial to smoking marijuana and to drinking and driving. She testified that she regularly stops by the bar on her way home from work for a couple of hours with co-workers. Contrary to Ms. Vidrine's own testimony and other evidence in the record, Brian Soileau testified that Ms. Vidrine only drinks for special events and he had never seen her drunk.

*Other Factors:*

E.V. consistently stated to Ms. Romero that at his mother's house, he has to watch shows about zombies (The Walking Dead), which were scary, gave him nightmares. E.V. also reported that at his mom's house he is often left with a caretaker until late, sometimes until after ten p.m., that they go to bed late, and that he is tired the next day.

E.V. described several instances indicating poor decision making by Ms. Vidrine, including a time his mom made him go to a cook-off when he was running a fever and sick and during which she ignored his repeated requests to go home. He also described a time where she wanted to leave him at a Halloween party where he knew no one so that she could go to an adults-only party.

Ms. Vidrine admitted to having poor communication with Mr. Vidrine. Dr. Bouillion stated Ms. Vidrine had no willingness to communicate with Mr. Vidrine and essentially the parties did not communicate except for the occasional text message.

Despite initially requesting copies of Ms. Romero's file on E.V., Ms. Vidrine refused to pick up a certified letter from Ms. Romero, cancelled her appointment to meet with Ms. Romero, and had not participated in E.V.'s counseling in any way. Dr. Bouillion testified that Ms. Vidrine's unwillingness to cooperate with E.V.'s counselor and to work with what her child was saying were evidence of poor moral fitness, especially since, as previously stated, "most moms would be breaking down doors." Dr. Bouillion summarized that Ms. Vidrine's refusal to acknowledge the kindle incident, to recognize the objective evidence of the bruises, to talk to the therapists, and to keep E.S. away from E.V. were signs of denial.

*E.V.'s credibility and preference:*

At his initial appointment with Ms. Romero, E.V. described his dad's house as fun, with a big yard, a bicycle, and a sister. He described his mom's house as not good, with a small yard. He relayed that at mom's house, he must watch "her shows" which are about zombies and are scary and give him bad dreams. E.V. reported that he prefers to live with his father. There are statements throughout Ms. Romero's records indicating E.V. regularly expressed a desire to stay at his dad's house, where he felt safe. Throughout the spring of 2016, E.V.'s fears that his mom would take him from his dad increased and he began exhibiting aggressive behaviors with anxiety-like symptoms. Ms. Romero noted that E.V. seemed genuinely scared of Ms. Vidrine.

E.V. described having a closer relationship with his father than his mother to Dr. Bouillion. Dr. Bouillion noted he (E.V.) "says that in a straightforward, heart felt way, kind of matter-of-factly, and he means it." Dr. Bouillion testified that E.V. was having difficulty dealing with his mother. He was exhibiting signs of and

describing anxiety, fear, bruises, drinking, and pressure by Ms. Vidrine not to talk to people about what goes on at her house.

When asked to describe his impression of E.V. and the disclosures he made, Dr. Bouillion testified that E.V. was not exaggerating and did not seem to be parroting things. Dr. Bouillion found E.V. to be consistent and credible. He described the incidents as being "a lot to swallow for a six-and-a-half-year-old."

The record supports that Mr. Vidrine is better equipped and able to provide a safe, nurturing home for E.V. He testified that his original concerns were Ms. Vidrine's drinking and driving, late nights out, and anger. He testified that he no longer works offshore or on shift work. He testified that he lives in the Mamou school district. He also testified that he was re-married and has two children with his new wife. He testified that E.V. had a good relationship with his step-mother and loves his half-siblings. He stated that he consented to a fourteen and fourteen shared physical custody schedule in 2013 because he had no other option; his job required him to be offshore two weeks at a time and he could not care for E.V. during those weeks. He is now home every evening and can and wants to care for E.V., who has his own bedroom at his house.

The record shows that Mr. Vidrine has been a constant source of stability and support for E.V. throughout his life, and it is obvious that his actions have been motivated by a desire to help E.V. When E.V.'s behavior began changing and he began to get upset about going to his mother's house, Mr. Vidrine made appointments for E.V. to see a licensed professional counselor, Ms. Lori Romero, to help E.V. when he changed custody and to give E.V. a safe place where he could talk about things that were bothering him.

32

The record also clearly shows that providing for E.V.'s medical needs, moral fitness of the parties, and willingness of each party to facilitate and encourage a close and continuing relationship between the child and the other parent weigh heavily in favor of Mr. Vidrine, as does his stable home environment.

Dr. Bouillion indicated that when he interviewed Mr. Vidrine, he was frustrated because DCFS refused to take any action about the bruising on E.V. and allegedly could not conduct minor-on-minor sexual abuse allegations. Mr. Vidrine believed Ms. Vidrine was allowing unsupervised contact between E.V. and E.S. He complained of difficulties reaching E.V. by phone when he was at his mom's. He indicated he was still concerned about Ms. Vidrine's drinking and driving and anger problems. He stated E.V. had begun crying at exchanges. He described E.V.'s relationship with his step-mother, Taylor and half-sister, D.V. as good. Dr. Bouillion testified that of the two parents, Mr. Vidrine was more realistic about E.V.'s strengths and weaknesses.

We have carefully reviewed the evidence in the entire record before us. We have applied the law to the facts of the case. As mandated by law, we have considered all twelve factors set forth in La.Civ. Code art. 134. Using these factors as a framework for our analysis, we find that a preponderance of the evidence in the record before us shows that the modification of physical and legal custody is in E.V.'s best interest, and that modification of the parties' physical custodial schedule is also in E.V.'s best interest. In his deposition, Dr. Bouillion specifically recommends against the present fourteen and fourteen custody split. We find that his reasoning is sound. Dr. Bouillion suggested a physical custodial schedule that would facilitate E.V.'s best interest, and we have used his recommendations as a framework for our decree.

Domiciliary Status and *Hodges v. Hodges*:

Prior to 2015, Louisiana's appellate circuits were divided on whether Louisiana law allowed parties to be designated as "co-domiciliary" parents under La.R.S. 9:335. Louisiana Revised Statutes article 9:335 governs joint custody judgments and joint custody implementation orders. It requires a court to render a joint custody implementation plan when granting joint custody to the parties and requires that implementation plan to address the parties' physical custodial time periods with the minor child and allocate legal decision-making authority and responsibility.

In 2015, the supreme court rendered its opinion in *Hodges v. Hodges*, 15-585 (La. 11/23/15), 181 So.3d 700, resolving once and for all whether parties could be designated co-domiciliary parents under La.R.S. 9:335.

Despite recognizing that decisions to designate co-domiciliary parents "may stem from a well-intentioned, but erroneous, belief that it is necessary for a court to use the term co-domiciliary parents in order to provide both parents with shared legal and physical custody[,]" the *Hodges* court found that La.R.S. 9:335 "unequivocally requires—that there can be only one domiciliary parent." *Hodges*, 181 So.3d at 708. The *Hodges* court explained that "[t]he designation [of co-domiciliary parents] does not validly 'allocate the legal authority and responsibility of the parents.'" *Id*.

In the case before us, Mr. Vidrine argues the parties' judgment granting co-domiciliary status is no longer legally permissible. Based on the facts and record in this case, we agree. La.R.S. 9:335 and *Hodges* mandate the designation of a single domiciliary parent. The Vidrines' present custody judgment and joint custody implementation plan provide for co-domiciliary status. Thus, a modification designating a single domiciliary parent is required.

CONCLUSION

Considering the record before us and the applicable law, and for the foregoing reasons, we find that a domiciliary parent must be appointed. We reverse the trial court's June 16, 2017 custody judgment and appoint of the father, Phillip Vidrine, as the domiciliary parent. We hereby further order as follows:

## DECREE

Judgment on Custody and Joint Custody Implementation Plan

It is further ordered, adjudged, and decreed as follows:

1.  The parties will exercise joint legal custody of E.V. with Phillip Vidrine designated the domiciliary parent.

2.  Pursuant to La.R.S. 9:335(B)(3), Phillip Vidrine has the authority to make all major decisions affecting E.V., including but not limited to: place of residence while E.V. is in his care, school attendance and location, and medical care and treatment, religious affiliation, and travel. Phillip Vidrine will also provide Danielle Vidrine with a copy of the current medical insurance card for E.V. The major decisions made by Phillip Vidrine are presumed to be in E.V.'s best interest, however, Danielle Vidrine may move to have the court review any major decisions Phillip Vidrine makes for E.V.

3.  In accordance with La.R.S. 9:335(A)(2)(a) and (B)(2), Phillip Vidrine will maintain physical care, custody, and control of E.V. at all times, except for those expressly granted to Danielle Vidrine herein.

4.  Danielle Vidrine will have physical custody of E.V. every other weekend from Friday after school (or 3:00 p.m. if school is not in session) until Monday morning when school resumes (or 8:00 a.m. if school is not in session).

5.  This physical custodial schedule will begin on the first Friday after this opinion is published and will continue unless modified by the court in the future.

6.  Additionally, during E.V.'s summer break from school, Danielle Vidrine is entitled to four separate and non-consecutive seven-day periods of physical custody, unless otherwise agreed to in writing by Phillip Vidrine. Danielle Vidrine shall notify Phillip Vidrine of the weeks she chooses in writing as early as possible and no later than May 15 of each year.

7.  Danielle Vidrine is prohibited from allowing E.S. to have any direct unsupervised contact with E.V. at any time. Contact, if any, between

E.S. and E.V., if occurring while E.V. is in the home of his maternal grandparents, is discouraged, and if contact is made at all, it is to be closely supervised by an adult.

8. Danielle Vidrine is prohibited from consuming alcohol, any illegal substances, and any prescription drugs not in accordance with the physician's directions twelve hours before and during her physical custodial periods of E.V. This prohibition enjoins Danielle Vidrine from operating a vehicle in which E.V. is a passenger after consuming any alcohol, illegal substances, or prescription drugs that have warnings concerning operation of a motor vehicle

9. Danielle Vidrine is prohibited from using corporal punishment of any kind on E.V., and from any displays of violence or actions such as "punching walls," screaming, or cursing at E.V.

10. The parties shall share custody of E.V. during all major holidays as they agree and can confirm in writing. Should the parties be unable to agree, the decision of Phillip Vidrine shall control. If the parties are unable to agree on any other aspect of visitation or child care of E.V., they are encouraged to engage in family mediation pursuant to La.R.S. 9:332. The decisions of Phillip Vidrine shall be binding unless modified by the mutual consent of the parties expressed in writing or ordered by a court of competent jurisdiction.

11. Notwithstanding the foregoing, assuming the child is not already in that parent's physical custody, Danielle Vidrine shall have the right to have E.V. on Mother's Day each year from 9:00 A.M. until 6:00 P.M. and Phillip Vidrine shall have the right to have E.V. on Father's Day each year from 9:00 A.M. until 6:00 P.M.

Since there was no appeal from the remaining provisions of the stipulated JCIP approved by the court on September 9, 2013, those provisions not in conflict with the orders and decrees herein shall remain in full force and effect.

Dr. Bouillion's expert witness fee is set at $1,500.00 and Ms. Romero's expert witness fee is set at $1,000.00 and both are taxed as court costs. All costs of both the trial and appellate court are assessed to Danielle Vidrine.

**REVERSED AND RENDERED**

PHILLIP VIDRINE

VERSUS

DANIELLE VIDRINE

AMY, J., concurring in the result.

I concur in the majority's determination that the trial court erred in concluding that there has not been a material change in circumstances since rendition of the September 2013 consent decree. Although the majority opinion finds legal error after reference to the consent decree, I instead find that the trial court's factual conclusion on this point constitutes an abuse of discretion. *See Gray v. Gray*, 11-548, p. 20 (La. 7/1/11), 65 So.3d 1247, 1259 (noting that a trial court's determination "in child custody matters is entitled to great weight, and its discretion will not be disturbed on review in the absence of a clear showing of abuse."). Significantly, the record indicates that Mr. Vidrine no longer works offshore for fourteen-day periods. However, that work schedule was the impetus for the original, alternating fourteen-day periods of physical custody and accompanying co-domiciliary parent status. The parties' testimony indicates that the original arrangement was initially workable. Yet, the obvious deterioration of the parties' relationship and the friction due to their differing parental decision-making styles indicates that the consent judgment's custodial arrangement no longer serves the minor child. Thus, I conclude that the record dictates a finding that Mr. Vidrine demonstrated a material change in circumstances.

Turning to the trial court's consideration of the best interest of the child analysis pursuant to La.Civ.Code art. 134, I find no error in much of the fact

finding revealed in its reasons for ruling. Certainly, the record supports the trial court's determinations that both parties love the minor child, are supportive of the child's schooling, and are adequately providing for the child's material needs. However, I conclude that the record further indicates that the trial court's evaluation of many of the remaining factors of Article 134 dictates the outcome proposed by the majority.

Finding the appellate record lacking clarity as to witness credibility on the difficult issues surrounding the allegations of inappropriate behavior, I do not join in the majority's specific findings in that regard. But I find it apparent that, absent wholly discrediting the child's reporting of the alleged incidents, the circumstances presented warrant Mr. Vidrine's designation as the domiciliary parent. They further require the restructuring of the physical custody arrangement as found appropriate by the majority. Notably, the trial court focused its inquiry on La.Civ.Code art. 134(10), concluding that the factor disfavored Mr. Vidrine as, in part, the investigation of allegations of abuse and litigation have "caused a great deal of stress and severely affected the relationship between the parties." Notwithstanding that observation, it is clear the consent decree's division of decision-making authority and the existing physical custody schedule have only exacerbated difficulties in the parent-child relationship. Accordingly, I conclude that the trial court abused its discretion in failing to modify that arrangement.

For these reasons, I join in the result reached by the majority.

2